THE PEOPLE ex rel. CRAWFORD, State Auditor, *v.* LOTHROP, County Clerk, etc.

1. Under section 307 of the Code, if the relator goes to trial without demurring to the answer to a petition for *mandamus*, he cannot afterward raise any question as to formal defects.

2. Under section 60 of the Code, a defendant may interpose inconsistent defenses, if each defense is in itself complete, and not inconsistent with itself.

3. Under section 61 of the Code, a demurrer may be interposed to the whole answer, and a separate demurrer may also be interposed to one or more of the defenses.

4. A mere averment of a conclusion of law is bad upon *demurrer*, and may be *stricken out*.

5. When a demurrer for irrelevancy, etc., goes to the whole answer, and it appears that any portion of the answer is material to the defense, the demurrer must be overruled.

6. The State board of equalization created by the Constitution is not, in any strict sense, a corporation, yet an act of the majority of the whole number at a stated meeting, every member having had due notice to attend, may be valid.

7. Where duties of a public, deliberative, and judicial nature are by law cast upon a board, *eo nomine*, an aggregate organ of the government, they may be performed by a majority of its members at a duly convened meeting, unless the law creating such board otherwise provides.     Although every member must be notified, a majority only need attend and act.

8. The statute (§ 2281, Gen. Laws), requiring the board of equalization to meet at a stated time and place was *notice* to every member of the board.

9. At an adjourned meeting of the board any business may be transacted that might have been transacted at the stated meeting.     It is in fact but a continuation of the stated meeting.·

10. The duty of the State board is to *adjust* and *equalize* the valuation of the real and personal property among the several counties, with the view of apportioning equitably the burthen of the State government.

11. The power to determine the valuation of taxable property is lodged in the assessors and the boards of county commissioners.     The State board of equalization may, for the purpose of adjusting and equalizing, increase the aggregate valuation of one county and decrease that of another, but it has no power to increase the aggregate valuation of property above the valuations as returned by the clerks of the several counties.

12. A levy of a State tax by the boards of county commissioners for the year 1877 was not necessary ; the effect of section 2283 (General Laws) is to levy,.by legislative declaration, a State tax for that year in specified cases.

DEMURRER to the answer to a petition for mandamus :
-. The sections of the Code passed upon but not set out in full in the opinion are as follows :

"SECTION 307. On the trial the applicant shall not be precluded by the answer of any valid objection to its insufficiency, and may controvert it by proof either in direct denial or by way of avoidance."

"SECTION 60. The defendant may set forth, by answer or cross complaint, as many defenses and counter-claims or set-offs, as he may have, whether the subject-matter of such defenses be such as were heretofore denominated legal or equitable, or both — they shall each be separately stated ; and the several defenses shall refer to the cause of action which they are intended to answer in a, manner by which they may be intelligibly distinguished."

"SECTION 61. When the answer contains new matter constituting a defense or a counter-claim or cross complaint or set-off, the plaintiff shall, within ten days (said days to be

computed from the time of the filing of said answer) reply or demur to the same for insufficiency, stating in his demurrer the grounds thereof ; and he may also, within the same time, demur to one or more defenses set up in the answer ; sham and irrelevant answers and defenses, and so much of any pleading as may be irrelevant, redundant, immaterial or insufficient, may be stricken out on demurrer, and upon such terms as the court in its discretion may impose."

The petition, answer and demurrer were as follows :

*To the Honorable, the Supreme Court of the State of Colorado :*

Your petitioners, David C. Crawford, as State auditor, on behalf of the people of the State of Colorado, respectfully represents and shows that on the 2d Monday of August, A. D. 1877, being the 13th day of August, the State board of equalization in and for the State of Colorado did convene and sit at the office of secretary of State, at the capital, pursuant to and by authority of the Constitution of the State of Colorado, and of an act " to provide for the assessment and collection of revenue and to repeal certain acts in relation thereto," approved on the 20th day of March, A. D. 1877, for the purpose of examining the various assessments of the several counties of the State, as far as regards the State tax, and to equalize the rate of assessment in the various counties of the State, and to adjust and equalize the valuation of real and personal property among the several counties of said State, as by the Constitution and said act contemplated, whenever, upon such examination, they should be satisfied that the scale of valuation in said counties had not been adjusted with reasonable uniformity, by the different assessors thereof, and to discharge such other duties as were imposed upon them by law ; that said board was duly adjourned from time to time, and met pursuant to adjournment, at the said office of secretary of State until the —— day of August, A. D. 1877, at which time abstracts of the assessment rolls of all the counties in said State had been

received by the State auditor, from the county clerks of each of the respective counties in said State, and said board did then and there publicly sit and proceed to act and discharge the duties imposed upon the said State board of equalization ; and that at said last-named meeting, the said abstracts of the assessment rolls were severally before the said board and duly considered ; that said board did then and there proceed to examine the various abstracts of the assessment rolls of property in the various counties in the State, for the year A. D. 1877, as far as the State tax was concerned, for the purpose of equalizing the rate of assessment in the various counties of the State, and to increase or diminish the aggregate valuation of real estate in any county, so as in their judgment to adjust and equalize the rate of assessment in the various counties of said State ; that upon such examination the said board of equalization became and were satisfied that the scale of valuations in the various counties of the State had not been adjusted with reasonable uniformity by the different assessors thereof, and that thereupon the said board being so satisfied, in the discharge of their said duty, then and there proceeded to equalize the rate of valuation of real and personal property among the several counties of the State, as regards the State tax ; that to that end, and in the discharge of their duty, the said board of equalization adjourned from day to day, and met pursuant to adjournment, at the office of secretary of State, until they had completed their work, as said board, to equalize the rate of assessment in the said various counties ; that said board did proceed, after said abstracts of the assessment rolls had been received, as in their judgment authorized, after careful examination and deliberation had, to adjust and equalize the rate of assessment of the various counties as far as regards State tax, and adjust and equalize the valuation of real and personal property among the several counties of the State, according to their best knowledge and judgment, and said board did ascertain that the valuation of the real estate in several counties of the State did not

bear a fair relation or proportion to the valuation in all other counties of the State, and thereupon they increased the aggregate valuation of the real estate of some of said counties, and diminished the aggregate valuation of the real estate of other of the said counties as much, and no more, than in their judgment was necessary to produce a just relation between all the valuations of real estate in the State ; that said board, in the discharge of duty, to adjust and equalize the valuation of real and personal property among the several counties of the State, made certain changes in the valuation and assessment of the real and personal property of·the county of Arapahoe from the valuation as shown by the abstract of assessment roll returned as aforesaid by Wilbur C. Lothrop, then and now being county clerk of Arapahoe county, to the State auditor, as follows : Increased the valuation of land 100 per centum, increased the valuation of horses 15 per centum, increased the valuation of mules 25 per centum, increased the valuation of cattle 71 per centum, and increased the valuation of sheep 30 per centum ; that the said action of the said State board of equalization in respect to the equalization of the rate of assessment,and the increase and diminution of the valuation of real estate aforesaid, and in respect to the said changes made in the assessment of Arapahoe county was agreed to by a majority of all the members of said board, as in their judgment just and right, and as authorized by law ; that thereafter, on the 1st day of September, A. D. 1877, the said State auditor, David C. Crawford, duly transmitted to each of the county clerks of the various counties of the State a statement of the changes so made in the assessment of his county by said board, and to Wilbur C. Lothrop, then and now being county clerk of the county of Arapahoe, the said State auditor duly transmitted a statement of the changes so made in the assessment of said county of Arapahoe, and the rate of State tax to be levied and collected in said county of Arapahoe, at the rate of 5 mills on the dollar; that said statement, so sent, was duly received by the said Wilbur C. Lothrop, county clerk, as

aforesaid, on or about the 1st day of September, A. D. 1877.

Your petitioner further complaining shows that the said changes in the assessment and valuation of the real and personal property of Arapahoe county were made by said board as aforesaid, as in their judgment was just and right, to adjust and equalize the valuation of real and personal property in said Arapahoe county with the valuation of the real and personal property of the several counties of the State, and said statement of changes so made and transmitted to, and received by the said county clerk of said Arapahoe county, have been by him disregarded, and he hath and still doth neglect and refuse to perform his duty in the premises, and he hath and doth wrongfully refuse, in making up the tax list in and for said county of Arapahoe, to compute and carry out in the proper column a State tax according to said change so made as aforesaid by the said board of equalization, and so transmitted to said clerk, contrary to the provisions of said act, and he, the said Wilbur C. Lothrop, county clerk of said Arapahoe county as aforesaid, hath wholly failed and refused, and doth continue to fail and refuse to discharge his duty herein, contrary to the provisions of said act.

Wherefore, inasmuch as said Wilbur C. Lothrop, county clerk as aforesaid, hath failed and refused, and doth fail and refuse to compute and carry out in the proper column a State tax at the rate as returned to him, as aforesaid, by said State board of equalization ; and, whereas, your petitioner further shows, that there is not a plain, speedy and adequate remedy in the ordinary course of law, whereby the said Wilbur C. Lothrop, county clerk as aforesaid, can be compelled, in making up his tax list, to compute and carry out in the proper column, a State tax according to the changes so made in the assessment of property in said Arapahoe county by said State board of equalization ; and your petitioner further shows that the only remedy whereby the people of the State of Colorado can or may realize from the

said county of Arapahoe its just quota of taxes for State purposes in accordance with, and pursuant to said act, is by the writ of *mandamus*.

Wherefore, your petitioner prays a writ of *mandamus* directed to the said Wilbur C. Lothrop, county clerk of said Arapahoe county, commanding him to proceed without delay in making up the tax list as required by said act, to compute and carry out in the proper column, a State tax according to the statement of the changes so made by the said State board of equalization, in the assessment of said Arapahoe county, and transmitted to him by the State auditor, at the rate of 5 mills on the dollar, to be collected within the said county of Arapahoe, and that such other and further order may be made in the premises as justice may require, etc.                          DAVID C. CRAWFORD.

STATE OF COLORADO,   } *ss :*
COUNTY OF ARAPAHOE, }

David C. Crawford, being duly sworn according to law, deposes and says that he is the petitioner named in, and who signed the foregoing petition ; that he is the auditor of the State of Colorado, and a member of the State board of equalization for the State of Colorado, and attended personally all the sittings of the said board mentioned and referred to in said petition, and participated in all the proceedings, deliberation and action of said board in said petition mentioned ; that the several matters and things in said petition set forth are true of his own knowledge except as to matters therein stated on information and belief, and as to those matters he believes them to be true.

DAVID C. CRAWFORD.

Sworn to and subscribed before me, }
this 22d day October, A. D. 1877. }

ORSON BROOKS,

{ Notarial Seal. }                          *Notary Public.*

IN THE SUPREME COURT OF THE STATE OF COLORADO.

The People ex rel. David C. Crawford,
as Auditor of State,
*agst.*
Wilbur C. Lothrop, County Clerk of
the County of Arapahoe.

*First.* The defendant, Wilbur C. Lothrop, answers the petition of the relator herein, and denies that the State board of equalization of the State of Colorado met at the office of the secretary of State, at the capitol of the State, on the second Monday of August, A. D. 1877, or at any other time after that date, pursuant to law, for the purpose of examining the various assessments of the several counties of the State, so far as regards the State tax, or to equalize the rate of assessment in the various counties of the State; or to adjust and equalize the valuation of real and personal property among the several counties of said State.

And he denies that the State board of equalization of the State of Colorado on or after the said second Monday of August, A. D. 1877, adjourned from time to time, or met pursuant to any adjournment at the office of the secretary of State or elsewhere, until the —— day of August, A. D. 1877.

And this defendant denies that the State board of equalization of the State of Colorado on the —— day of August, A. D. 1877, sat publicly at the office of the secretary of State, or proceeded to act and discharge the duties imposed upon the State board of equalization; and he denies that at that time, the abstracts of the assessment rolls of the several counties of the State were before the State board of equalization, or were duly considered by said State board; and he denies that the State board of equalization ever, at any time, examined the various abstracts of the assessment rolls of property in the various counties in the State for the year 1877, as far as the State tax was concerned, for the purposes in said petition stated, or for any other purpose;

and he denies that the State board of equalization of the
State of Colorado ever became or was satisfied, that the
scale of valuations in the various counties of the State had
not been adjusted with reasonable uniformity by the differ-
ent assessors thereof; and he denies that the State board of
equalization of the State of Colorado ever proceeded to
equalize, or ever did equalize, the rate of valuation of real
and personal property among the several counties of the
State as regards the State tax ; and that in the discharge of its
duty the said State board of equalization of the State of
Colorado adjourned from day to day and met pursuant to
such adjournment at the office of the secretary of State, un-
til it had completed its work, as alleged in the said relator's
petition herein ; and he denies that after the abstracts of the
assessment rolls had been received, the State board of
equalization of the State of Colorado proceeded to adjust
and equalize, or ever did adjust or equalize, the valuation of
real and personal property among the several counties of
the State, according to its best knowledge and judgment ;
and he denies that the State board of equalization of the
State of Colorado ascertained that the valuation of real
estate in several counties of the State did not bear a fair
relation and proportion to the valuation in all other counties
of the State ; and he denies that the State board of equali-
zation of the State of Colorado thereupon increased the
aggregate valuation of the real estate of some of the said
counties and diminished the aggregate valuation of the real
estate of other of said counties, as much, and no more, as
in its judgment was necessary to produce a just relation
between all the valuations of real estate in the State ; and
he denies that the said State board of equalization in the
discharge of its duty, to adjust and equalize the valuation
of real and personal property among the several counties
of the State, made certain changes in the valuation and
assessment of the real and personal property in the county
of Arapahoe from the valuations as shown by the abstract
of assessment roll returned by the county clerk of said.

county to the auditor of State; and he denies that the State board of equalization of the State of Colorado increased the valuation of land in Arapahoe county one hundred per centum; the valuation of horses fifteen per centum; the valuation of mules twenty-five per centum; the valuation of cattle seventy-one per centum, and the valuation of sheep thirty per centum; and as to the allegation in the relator's petition, that on the 1st day of September, A. D. 1877, the auditor of State duly transmitted to each of the county clerks of the various counties of the State a statement of the changes alleged to have been made in the assessment of his county by the said State board of equalization, this defendant states that he has not and cannot obtain sufficient knowledge or information upon which to base a belief.

*Second.* And for a second and further answer to the petition, this defendant admits:

That he is now, and on the first day of September last past was, the county clerk of said county of Arapahoe;

That, as such county clerk, on or about the 1st day of September, A. D. 1877, he received from the auditor of State a statement in writing containing certain changes in the valuation of real and personal property in the county of Arapahoe, purporting to have been made by the State board of equalization of the State of Colorado, which said statement is the same referred to by the relator in his petition herein, as this defendant is informed and verily believes, and none other or different, but this defendant denies that any such changes in the valuation of the real and personal property in said county of Arapahoe, as were contained in said statement, were ever made, or authorized to be made, by the State board of equalization of the State of Colorado, or by a majority of the members of the said State board of equalization at any meeting of the said board; and he denies that the changes in the valuation of the real and personal property of said county of Arapahoe, which appeared in said statement so as aforesaid received from the said auditor of State, were ever made by the said State board of equalization, as

in its judgment was just and right to adjust and equalize the valuation of real and personal property in said county of Arapahoe with the valuation of· real and personal property of the several counties of the State ; and this defendant denies that any such changes as appeared upon the said statement were necessary to be made in the valuation of the real and personal property of said county of Arapahoe for the year 1877 in order to equalize and adjust the valuation of the real and personal property of said county of Arapahoe with the valuation of real and personal property of the several counties of the State ; and this defendant further admits that he, as such county clerk, has disregarded the changes in the valuation of real and personal property in said county of Arapahoe as appeared in the said statement so as aforesaid received by him, and that he has refused, in making up the tax list for said county of Arapahoe, for the year 1877, to compute and carry out in the proper column a State tax according to said changes in said statement contained, for the reason that, as he is advised and believes, no such changes were ever made by the State board of equalization of the State of Colorado ; and that such changes were contrary to the spirit and intent of the constitution and laws of this State ; and that it was his duty to disregard all such changes in carrying out the State tax for the year 1877, upon the assessment roll of said county of Arapahoe ; and he denies that, as he is advised and verily believes, such refusal was, or is, contrary to the Constitution and laws of this State.

*Third.* And for a third and further answer this defendant, upon information and belief, avers :

That on the 13th day of August, A. D. 1877, being the 2d Monday of August, A. D. 1877, the governor, auditor of State, State treasurer, and attorney-general, members of the State board of equalization, met at the office of the secretary of State, at the capitol of the State ;

That on that occasion the secretary of State was absent and took no part in the deliberations or proceedings of the other members of said State board ;

That the other members of said State board, to wit : the governor, the auditor of State, the State treasurer, and the attorney-general, assuming to act as the State board of equalization of the State of Colorado, transacted no business, and adjourned to the 20th day of August, 1877 ;

That on the 20th day of August, 1877, the said auditor of State, State treasurer, and attorney-general, members of said State board, again met at the office of the secretary of State in Denver; that the governor and secretary of State did not, nor did either of them, meet with or take any part in the deliberations of the other members of said State board ;

That the said auditor of State, State treasurer, and attorney-general did no business at that meeting except to direct the auditor and the clerk of said members of said board to prepare tables of the assessment returns for the year 1876 and of the year 1877, so far as the same had been received, and to adjourn, which they did to the 27th day of August, 1877 ;

That afterward, and on the 31st day of August, A. D. 1877, the said auditor of State, State treasurer, and attorney-general, members of said State board of equalization, again met at the office of the secretary of State in the city of Denver ; that the governor and secretary of State did not, nor did either of them, have any notice of a meeting of the State board of equalization on that day ; and the said governor and secretary of State did not, nor did either of them, on that day meet with, or take any part in the deliberations of the other members of said State board ;

That on the said 31st day of August, A. D. 1877, the said auditor of State, State treasurer and attorney-general assuming to be, and to act as the State board of equalization of the State of Colorado, and in the absence of the other members of said board, and without authority of law, proceeded to examine the various assessments as far as regards the State tax, and to make certain changes in the rate of assessment in the various counties of the State ; and then and there, contrary to the true intent and spirit of the constitution and laws of this State, called before them and

took the advice and opinion of sundry farmers, ranchmen, stock breeders and money lenders as to the proper value of real and personal property in the different counties of the State, and. compared the abstracts of the assessments from the various counties of the State returned in previous years with the abstracts for the year 1877, for the purpose of equalizing the valuation of property in the various counties of the State, and then and there, instead of equalizing the rate of assessment in the various counties in the State, whenever the scale of valuation had not been adjusted with reasonable uniformity by the different assessors and by increasing the aggregate valuation of the real estate of such counties in the State, as was relatively too low in proportion to the valuation of real estate in the other counties in the State, and diminishing the aggregate valuations of real estate of such counties of the State as was relatively too high in proportion to the valuation of the real estate of the estate of the other counties of the State, so as to produce a just relation between all the valuations of real estate in the State, increased the aggregate valuation of the real and personal property over and above the valuations as returned by the clerks of the following counties as follows:

| | |
|---|---:|
| The county of Arapahoe | $960,255 90 |
| The county of Bent | 224,038 45 |
| The county of Boulder | 630,654 70 |
| The county of Douglas | 305,389 60 |
| The county of Elbert | 409,008 95 |
| The county of El Paso | 383,818 90 |
| The county of Gilpin | 55,025 00 |
| The county of Huerfano | 12,538 14 |
| The county of Jefferson | 547,979 05 |
| The county of Lake | 272 85 |
| The county of La Plata | 5,962 50 |
| The county of Larimer | 305,330 85 |
| The county of Las Animas | 24,648 98 |
| The county of Park | 11,303 00 |

The county of Pueblo......................  $644,332 70
The county of Rio Grande..................    2,694 50
The county of Routt.......................   49,206 50
The county of Saguache....................   28,568 73
The county of Summit......................      408 72
The county of Weld........................  889,545 20

$5,490,993 32

That said auditor of State, State treasurer and attorney-general assuming to be the State board of equalization of the State of Colorado, at the same time and place diminished the aggregate valuations of the following named counties as follows:

The county of Conejos.....................   $1,852 80
The county of Costilla....................    5,287 00
The county of Custer......................   26,834 05
The county of Fremont.....................   15,617 00

$49,590 85

And made no changes whatever in the valuations of the property in the other counties of the State, thereby making a net increase in the aggregate valuation of all the counties in the State, above the aggregate valuations as returned by the clerks of the several counties, of $5,441,402.47 as will more fully and at large appear by reference to the tabular statement hereto attached, and made a part of this answer, and to which the defendant begs leave to refer if it becomes necessary for him to do so.

That in making such net increase in the aggregate valuations of all the counties as aforesaid, above the aggregate valuations as returned by the clerks of the several counties, the said auditor of State, State treasurer and attorney-general increased the aggregate valuation of the property in the said county of Arapahoe as follows:

They increased the value of lands one hundred per centum, thereby fixing the valuation of lands in said county at the average value of $13.06 per acre, while the equalized valuation of all the lands in the State as returned by the clerks of the several counties is only $5.63 per acre.

They increased the valuation of horses in said county fifteen per centum, thereby fixing the valuation of horses per head in said county at $45.89, while the equalized valuation of all the horses in the State as returned by the clerks of the several counties is $43.41 per head.

They increased the valuation of mules in said county twenty-five per centum, thereby fixing the valuation of mules in said county at $64.24 per head, while the equalized valuation of all the mules in the State as returned by the clerks of the several counties is $66.33 per head.

They increased the valuation of cattle in said county seventy-one per centum, thereby fixing the valuation of cattle in the said county at $12.02 per head, while the equalized valuation of all the cattle in the State as returned by the clerks of the several counties is $10.02 per head.

They increased the valuation of sheep in said county thirty per centum, thereby fixing the valuation of sheep in said county at $1.70 per head, while the equalized valuation of all the sheep in the State as returned by the clerks of the several counties is $1.63 per head.

All which will more fully and at large appear by reference to the said tabular statement hereto attached, and to which this defendant begs leave to refer.

That the changes so as aforesaid made by the said auditor of State, State treasurer, and attorney-general, in the valuation of the real and personal property of said Arapahoe county, for the year 1877, are the same changes therein alleged by the relator herein to have been made by the State board of equalization of the State of Colorado, and none other or different.

*Fourth.* And this defendant further answering avers, that as he is advised and believes, and he so charges the truth to be, the said David C. Crawford, auditor of State,

George C. Corning, State treasurer, and Archibald J. Sampson, attorney-general, do not, and never did, constitute the State board of equalization of the State of Colorado, and that they, the said Crawford, Corning and Sampson, had no right, power, or authority whatever, in the absence of the governor and secretary of State, to sit as a State board of equalization or to make any changes in the valuation of the real and personal property in the several counties of the State as returned by the several county clerks; that the State board of equalization never met, nor considered, nor examined the various assessments, nor equalized the rate of assessment in the various counties in the year 1877, and never made any changes whatever in the valuation of real or personal estate in the county of Arapahoe for the year 1877; and he is advised, and so charges the truth to be, that all the changes made in the valuation of real and personal property in said county of Arapahoe, so far as regards the State tax, were made by the said David C. Crawford, auditor of State, George C. Corning, State treasurer, and Archibald J. Sampson, attorney-general, and that such changes were made without authority of law, and were irregular, improper, null and void.

*Fifth.* This defendant, further answering, denies each and every allegation in said petition contained not hereinbefore specifically denied, admitted, or controverted.

Wherefore this defendant prays that the peremptory writ of mandamus prayed against him may be denied.

WILBUR C. LOTHROP.

WM. B. MILLS, *Attorney for the defendant.*

STATE OF COLORADO, } *ss.:*
COUNTY OF ARAPAHOE. }

Wilbur C. Lothrop, being duly sworn, deposes and says: that he is the defendant in the above-entitled proceeding; that he has heard read the foregoing answer by him subscribed, and knows the contents thereof; and that the same is true of his own knowledge, except as to the matters

therein stated upon information and belief, and as to those matters he believes it to be true.

WILBUR C. LOTHROP.

Subscribed and sworn to this 24th day of }
    October, A. D. 1877, before me. }

LORIN A. STALEY.

[Notarial Seal.]                                    *Notary Public.*

IN THE SUPREME COURT OF THE STATE OF COLORADO.

| |
| --- |
| The People ex rel. David C. Crawford |
| *agst.* |
| Wilbur C. Lothrop, County Clerk of Arapahoe County. |

The relator demurs to the answers of the defendant, taken together, for insufficiency.

*First.* Because taken as a whole the facts alleged, admitted, and denied therein, do not constitute a defense or cause for denying the writ prayed for in the petition.

*Second.* Because it appears upon the face of said answers taken together, and is manifest, that the whole thereof are framed and founded not upon fact, but upon a supposed fiction of law, that a meeting of the majority of the members of the board of equalization on the day appointed by law for the session of the board, and at subsequent adjourned meetings, were not meetings of said board in point of law, and the action had at such meetings was not, in point of law, the action of said board, and such action was not binding in law upon the defendant.

*Third.* Because the several answers of said defendant are inconsistent and repugnant in this, that in one, the meeting of said board on the day appointed by law, to wit: the second Monday of August, is denied, and in another, it is admitted that on that day a majority of the members of

said board assembled. In this also, that while in one answer it is denied that said board adjourned from day to day, in another, it shows that a majority of said board met on said 13th of August, and adjourned said meeting, and it is not averred that said majority did not adjourn from that day, from day to day, until and including the meeting of the 31st of August, when the action in controversy was taken. In this also, in one answer, it is denied that said board acted at any of said meetings in the various particulars set out in the petition respectively, but it is not denied that the majority, which another answer avers did attend the meetings, acted as averred in the petition, but avers that such action was had at such meetings of the majority. In this also, in one answer, it is denied that the two members, whom it is averred did not attend the meeting of the 31st of August, had notice of that meeting, but it is not averred that said first meeting was not adjourned from time to time from the second Monday of August, to and including the meeting of the thirty-first by the majority shown to have attended and acted at the several meetings, and it is not shown that such adjournments were not notice of the several meetings held in pursuance thereof, to all the members of said board. In this also, it is denied in one answer, that any changes in assessments were made by said board at any meeting thereof, and in another, it is averred, that the changes in question were made at said meeting attended by a majority on the 31st of August, and that the defendant received the same. In this also, that in respect to all other material matters of action averred in the petition, which in one answer are denied, are respectively averred or admitted in other answers, to have been done or performed by the majority.

The relator demurs to the second answer of the defendant.

*First.* For insufficiency. Because it does not state facts sufficient to constitute a defense, or cause for denying the writ prayed for in the petition.

*Second.* Because it states the following irrelevant, redundant, and immaterial matters, respectively and exclusively within the jurisdiction of said board to determine, and which cannot properly be inquired of here, viz: "and this defendant denies that any such changes as appeared upon said statement were necessary to be made in the valuation of the real and personal property of said county of Arapahoe, for the year 1877, in order to equalize and adjust the valuation of the real and personal property of said county of Arapahoe with the valuation of the real and personal property of the several counties of the State."

*Third.* Because it states the following irrelevant, immaterial and redundant matter, the same being the defendant's conclusions of law, and not a statement of fact, viz: "and that such changes were made contrary to the spirit of the Constitution and laws of this State."

The relator demurs to the third answer of the defendant.

*First.* For insufficiency. Because it does not state facts sufficient to constitute a defense, or cause for denying the writ prayed for in the petition.

*Second.* For that all the matters after the phrase " various counties of the State," where the same first occurs in said third answer, to and including the end thereof, is irrelevant, immaterial, and redundant. Because portions thereof state the defendant's conclusions of law, and not facts. Because it seeks to impeach the action of said board, for alleged errors in respect to matters within its exclusive jurisdiction and cognizance which cannot properly be inquired of here. Because it seeks to impeach the decision of said board for acting upon alleged improper evidence or information. Because portions thereof are argumentative. Because it is multifarious, and tenders a multitude of material issues. Because it seeks to measure the judgment of said board respecting matters within its exclusive jurisdiction and cognizance, by the judgment of the defendant.

The relator demurs to the fourth answer of the defendant.

*First.* For insufficiency. Because it does not state facts

sufficient to constitute a defense, or cause for denying the writ prayed for in the petition.

*Second.* Because it states the following immaterial, irrelevant, and redundant matter, and defendant's conclusions of law, viz : " the said David C. Crawford, auditor of State, George C. Corning, State treasurer, and Archibald J. Sampson, attorney-general, do not, and never did, constitute a State board of equalization of the State of Colorado, and they, the said Crawford, Corning and Sampson, had no right, power, or authority, whatever, in the absence of the governor and secretary of State, to sit as a State board of equalization, in the valuation of the real and personal property in the several counties of the State, as returned by the several county clerks."

*Third.* Because it states the following conclusion of the defendant, upon matters of law, viz : "and that such changes were made without authority of law, and were irregular, improper, null and void."

A. J. SAMPSON,
*Attorney-General.*

A. W. BRAZEE and J. Q. CHARLES, of counsel.

Mr. W. B. MILLS, county attorney, and Messrs. WELLS, SMITH & MACON, for respondent.

*By the Court.* At the threshold of this case we are confronted by questions of procedure arising under the Code, upon a correct solution of which will depend, in a large measure, the disposition of the demurrer interposed to the return to the alternative writ of *mandamus.* We are without adjudications of our own. By the Code of Civil Procedure hitherto untried in Colorado, adopted by the first *State* legislature, and by the recognized principles of sound pleadings and of the law not inconsistent with the provisions of the the Code, the fate of this demurrer must be determined. Sec-

tion 307 of the Code (Ch. XXXII, concerning "the writ of mandamus") provides that "on the trial the applicant shall not be precluded by the answer of any valid objection to its sufficiency, and may controvert it by proof either in direct denial or by way of avoidance." It is contended that as the relator in a mandamus proceeding is by this section given the right to demur *ore tenus* at the trial, he is not at liberty to demur in advance of the trial. We cannot yield our assent to this position. If he goes to trial without demurring, he cannot afterward raise any question as to formal defects.

This section sanctions the doctrine that where the defense interposed is substantially defective the complainant is not "precluded at the trial from raising any valid objection to its sufficiency." A proper interpretation of this provision will not permit questions as to mere matters of form to be raised at the trial. It does not militate against the right of the complainant to demur at an earlier stage — a right elsewhere secured by the Code whose provisions are as applicable to the pleadings in a proceeding for a *mandamus* as to those in any action. *People* v. *The Board of Supervisors of San Francisco,* 27 Cal. 655.

A ground of demurrer going to the whole answer is that the several defenses therein set up are inconsistent with each other. Section sixty of the Code provides "the defendant may set forth by answer, or cross complaint, as many defenses and counter-claims or set-offs as he may have, whether the subject-matter of such defenses be such as were heretofore denominated legal or equitable, or both, they shall each be separately stated ; and the several defenses shall refer to the causes of action which they are intended to answer in a manner by which they may be intelligibly distinguished."

May the defendant, under this section, interpose inconsistent defenses? It unquestionably gives him the right by his answer to set up as many defenses as he may have without any *express* qualification as to whether they shall be consonant with each other. It is not doubted that each de-

fense separately pleaded must be sufficient in itself. In determining the legal sufficiency of each defense, as a general rule reference must not be had to any matter *dehors* the defense itself, although it may be contained in the same answer. Each defense separately considered must be complete. The several pleas or defenses must be examined independently of each other. If there be contained in a defense matters which are repugnant to each other, the defense is ill. But when one of several defenses in an answer is consistent with itself, yet, taken as a whole, is inconsistent with any one or all of the other defenses, is the answer bad? Can courts, without a forced construction of the language of the section under consideration, deprive the defendant of the right which, by its natural import, it seems to confer? This section, or a section whose provisions are quite similar, has been enacted in many of the States where the Code system prevails. Section forty-nine of the Practice Act of California, which was substantially re-enacted as section four hundred and forty-one, in the Code of Civil Procedure (1872) of that State, is almost identical with section sixty of our Code. The earlier decisions of the supreme court of that State, as to the proper construction of this provision and the true mode of reaching inconsistent defenses, if their interposition is inhibited by the section, whether by demurrer or motion to strike out, or to compel the defendant to elect by which defense he would stand, are in conflict. *Young* v. *Bell et al.*, 46 Cal. 201; *Klink and wife* v. *Cohen et al.*, 13 id. 623; *Undias* v. *Morrell*, 25 id. 31; *Bell* v. *Brown*, 22 id. 681; *Wilson* v. *Cleaveland*, 30 id. 200.

In the later case of *Buhue* v. *Corbett*, 43 Cal. 269, in which the question of inconsistent defenses was directly presented, Chief Justice Wallace, speaking for the court, all the judges concurring, says: "If the plaintiff desired to present that question, he should have moved to strike out the one or the other, or applied for an order compelling the defendants to elect as to which particular one of them

they would rely upon. But had he, even by motion, presented the question of the supposed inconsistency of the several defenses in the answer, we think that it would not have availed him. A party defendant in pleading may plead as many defenses as he may have. If a plea or defense separately pleaded in an answer contain several matters, these should not be repugnant or inconsistent in themselves. But the plea or defense regarded as an entirety, if it be otherwise sufficient in point of form or substance, is not to be defeated or disregarded merely because it is inconsistent with some other plea or defense pleaded. And there is no distinction in this respect between pleadings verified and unverified."

These views appear to be in harmony with the letter and spirit of the section under examination.

Pomeroy's Remedies and Remedial Rights, § 722. Under section 1, ch. LXX, concerning practice (R. S. 1868, p. 504), which is substantially the same in this respect as section sixty of the Code, any number of pleas, however inconsistent, could be interposed. Such was the uniform practice. Even if we were to follow the modified rule adopted in New York (*Hopper* v. *Hopper*, 11 Paige's Ch. 46 ; *Hollenbeck* v. *Clow*, 9 How. Pr. 282), that the Code will not tolerate several defenses that are so inconsistent with each other that the proof of one would *necessarily* disprove the other, the defenses here interposed would not be obnoxious to that rule of construction. This ground of demurrer to the entire answer is not well taken. A question is made respecting the demurrer, that it must be taken as a demurrer to the entire answer, and cannot be treated as a separate demurrer, so that, if any one of the several defenses set up therein is sufficient, it must be overruled.

The demurrer in its commencement is stated in terms to be "to the answer of the defendant taken together" for insufficiency, and sets forth *in extenso* grounds of objection to each and all of the defenses interposed by the answer. Following this the relator in terms "demurs to the second

answer of the defendant'' for insufficiency, and sets forth grounds of demurrer to this separate defense.

In like manner he demurs separately to the third and fourth defenses.

This demurrer must be treated, not only as a demurrer to the whole answer, but as a separate demurrer to each separate defense demurred to therein.

The intention of the relator is evident to refer separately to the decision of the court, the legal sufficiency of each separate defense, as well as the legal sufficiency of the answer taken as a whole. Such is its plain language, and there is no room for any other construction. That a demurrer may be interposed to the whole answer, and to one or more of the defenses set up therein, seems to be contemplated by section sixty-one of the Code. The same section of the Code provides that so much of any pleading as may be irrelevant, redundant or immaterial may be stricken out on demurrer, and we will first consider the objections of this character made by the relator.

To the second defense it is objected (1) that the following is irrelevant, redundant and immaterial, to wit: "And this defendant denies that any such changes as appeared upon said statement were necessary to be made in the valuation of the real and personal property of said county of Arapahoe, for the year 1877, in order to equalize and adjust the valuation of the real and personal property of said county of Arapahoe, with the valuation of the real and personal property of the several counties of the State," and (2) that the following is irrelevant, redundant and immaterial, to wit: "And that such changes were made contrary to the spirit of the Constitution and the laws of this State."

The objections are well taken. The first denial is not in response to any allegation of the petition, nor does it tender an issue that can be considered by this court. The board was the sole judge as to what was necessary to the proper adjustment and equalization of the tax so long as it acted within its constitutional and statutory jurisdiction. This

court can only inquire whether it did so act within the limits of its authority.

The second denial is the denial of a conclusion of law, which cannot form an issue capable of trial, and is not admissible under any system of pleading. Van Santvoord's Plead. p. 416*.

The matter objected to in this defense will accordingly be stricken out.

To the third answer it is objected upon the same grounds that all after the phrase " various counties of the State " where it occurs in the answer, should be stricken out.

This claim is too broad and must be denied. While this portion of the answer contains much that may be deemed irrelevant matter it also contains allegations which tender an issue upon the power of the State board to increase the aggregate amount of the valuation as returned by the clerks of the several counties. In objecting to the specific matter as irrelevant, redundant or immaterial, the pleader should be careful to include in his specifications only such portions of the answer as are clearly obnoxious to the objection, for the reason that, if any portion of it should appear material to the defense or a proper disposition of the cause, the objection being entire, must be overruled. Van Santvoord's Plead. p. 523*.

To the fourth defense it is objected (1) that the following is irrelevant, redundant and immaterial, to wit: "The said David C. Crawford, auditor of State, George C. Corning, State treasurer, Archibald J. Sampson, attorney-general, do not and never did constitute a State board of equalization of the State of Colorado, and they, the said Crawford, Corning and Sampson, had no right, power or authority whatever, in the absence of the governor and secretary of State, to sit as a State board of equalization in the valuation of the real and personal property in the several counties of the State as returned by the several county clerks," and (2) that the following is irrelevant, redundant and immaterial, to wit: "and that such changes were made with-

out authority of law and were irregular, improper, null and void.''

Each of these allegations assert nothing but a conclusion of law and will be stricken out.

The third defense, set up in the answer, proceeds partly on the assumption that the State board of equalization can only act legally when all its members attend its meetings. This defense presents the question whether, when a board is created charged by law with the duty of exercising a public function, and when all the members thereof are duly notified of the time and place of its meeting, the presence of every member of such board is necessary to the validity of its action.   When an authority is granted to several persons to transact business of a private nature, the general rule doubtless is that unless they act jointly in the execution of the authority, their acts are void.

In the case of a corporation, if a corporate act is to be done, by a definite body, as by a board of directors or trustees, where the charter and by-laws are silent, a majority, at least, must be present to constitute a quorum, but a majority of that quorum may do the act.   Angell and Ames on Corporations, § 502 ; Green's Brice's *Ultra Vires*, 458 ; 2 Kent's Com. *293 (12th ed.)

The State board of equalization is not in any strict sense a corporation, yet it has in some respects the similitude of a corporation.   It is termed by the Constitution which creates it a *board*, and by that instrument it is endued with perpetuity.   The board consists of the present incumbents of the offices of governor, State auditor, State treasurer, secretary of State and attorney-general and their *successors* in office. Like corporations, it must, by implication at least, keep a record of its proceedings.   But here the analogy ends.   The members of the board are only such *ex-officio*. The question recurs, can an act of the board be valid, done at its stated meeting, if every member be not present ?

The respondent contends for the broad rule laid down in the opinion of Chief Justice EYRE in the case of *Grindley*

*v. Barker*, 1 Bos. & Pul. 236, that "where a number of persons are intrusted with powers not of mere private confidence, but in some respects of a general nature, and *all* of them are regularly assembled, the majority will conclude the minority, and their act will be the act of the whole." This, as a general proposition, cannot be questioned, but so far as the opinion inferentially announces that the act of a majority, where all are duly notified, is not the act of the whole unless all are present, it was not responsive to the question before the court.

In that case the point involved was whether a condemnation of leather made by four out of six triers who had been duly appointed pursuant to statute, the entire number having assembled and having taken part in the trying of the leather, must be regarded as a condemnation by all six —not whether, if one of the triers had *refused*, or neglected to meet with the others, the remaining five would not have been competent to act. The rule as broadly laid down in that case, without any qualification whatever, is not, we conceive, the universally accepted doctrine in England. *Rex* v. *Beeston*, 3 Term, 592 ; *Witherell* v. *Gartham*, 6 id. 383 ; *Doe dem. Read* v. *Godwin*, 16 E. C. L. 37.

In this country, the dictum of Chief Justice EYRE, from which the broad, unqualified rule is sought to be deduced, has been frequently cited with approval, but seldom in a case where its application was necessary to determine the controverted question.

In *Greene* v. *Miller*, 6 Johns. 39, the point decided is that, where a controversy between private parties is, by agreement, submitted to five arbitrators, it is necessary that all should concur in the award, unless the agreement otherwise provided. This is distinctly put upon the ground that a submission to arbitrators in such case is a delegation of authority *for a mere private purpose.* The citation of the suggestion in *Grindly* v. *Barker*, with approval, was *obiter*.

In the case of *Brown* v. *Cook*, 9 Johns. 360, the question presented was not whether the act of a meeting of the com-

missioners of highways duly convened would be valid, if a majority only attended, but whether without any meeting the commissioners could individually act and order the removal from the highways of an encroachment thereon.

In *Ex parte Rogers*, 7 Cowen, 526, the point determined was that where three persons, who, by law, were constituted a board of appraisers convened and conferred, but only two joined in the award, the third, although actually present, declaring himself absent and refusing to unite in the award, the act of the majority was the act of the board. The question whether if the dissentient member, being notified, had failed to attend, the act of the majority would not have been valid, was not properly before the court. Following the dictum in the case of *Grindly* v. *Barker*, the legislature of New York, December 10th, A. D. 1828 (2 R. S., Ch. VIII, tit. XVII, § 27), enacted as follows : "Whenever any power, authority or duty is confided by law to three or more persons, and whenever three or more persons or officers are authorized by law to perform any act, such act may be done and such power, authority or duty may be exercised and performed by a majority of such persons or officers upon a meeting of *all* the persons so intrusted or empowered, unless special provision is otherwise made."

The decisions in the cases of *McCoy* v. *Curtice*, 9 Wend. 18; *Downing* v. *Rugar*, 21 id. 178; *The People* v. *Whiteside*, 23 id. 9; *Keeler* v. *Frost*, 22 Barb. 400; *People* v. *Supervisors Chenango County*, 11 N. Y. 571; *Doughty* v. *Hope*, 3 Denio, 253; *Lee* v. *Parry*, 4 id. 125, cited and relied on by counsel for respondent, were rendered subsequent to the enactment, and we must believe were controlled by the provisions of this section. They, therefore, have very little authoritative force in this case. But even under this section, as mandatory as it seems to be, it is conceded that if the absent member of the board had been notified, the act of the majority would be deemed to be the act of the board.

In the case of *McCoy* v. *Curtice*, cited *supra*, the court says : "There can be no doubt that a contract made by all

of the trustees and signed by two would be binding, or that two could contract against the will of the third, if he was duly *notified* or consulted and refused to act."

The opinion of the court in the case of the *People* v. *Coghill*, 47 Cal. 361, to the effect that in order to the validity of the assessment made by the board of commissioners it was necessary that they should *all* act, both in viewing and assessing the swamp land, was founded upon a statute which in terms declared that "the three commissioners shall *jointly* view and assess upon each and every acre to be reclaimed or benefited thereby, a tax proportionate to the whole expense, and to the benefits which shall result from such works," etc. (Stat. of Cal. 1867-8, 516.) It was held that the statute which, by express language and not by implication, merely required *joint* action, must be pursued.

The case of *Charles* v. *The City of Hoboken*, 3 Dutcher (27 N. J.), 203, but affirms the doctrine that where an authority judicial in its character is conferred upon a body consisting of two *integral* parts — in that instance of a mayor and council—it cannot be exercised by either in the absence of the other.

In the *State* v. *Pratt*, 5 Halstead (10 N. J.), 161, it was held that an order of filiation must be executed by the *two* justices jointly, and not separately. The majority rule could not have been invoked in this case.

The general rule to which the authorities advert is to, be applied with certain important exceptions and modifications which we will hereafter indicate. That eminent jurist, Chief Justice SHAW, in *Williams* v. *The School District in Lunenberg*, 21 Pick. 75, lays down the doctrine which we conceive applicable to the State board of equalization, with clearness and precision, a doctrine in harmony with the spirit and genius of our republican government.

The question before the court was, whether an assessment made by two out of a board of three assessors, the third having been notified, was valid, a question in principle somewhat analogous to the one under consideration.

Speaking for the court, the learned chief justice says : " Where a body or board of officers is constituted by law to perform a trust for the public or to execute a duty prescribed by law, it is not necessary that all should concur in the act done. The act of the majority is the act of the body, and where all have had due notice of the time and place of meeting, in the manner prescribed by law, or by the rules and regulations of the body itself, if there be any, otherwise, if reasonable notice be given, and no practice or unfair means are used to prevent all from attending and participating in the proceedings, it is no objection that all the members do not attend, if there be a quorum. In the present case all three having had an *opportunity* to act, the act of two is sufficient." In the *Commonwealth ex rel. Hall* v. *The Canal Commissioners*, 9 Watts, 466, in which the question referred to the decision of the court was, whether the act of a board of appraisers (one of whose members had resigned) in making an appraisement of the damages done to the relator's land by reason of the construction of a canal was valid, the court, Chief Justice GIBSON delivering the opinion, affirmed its validity. The court substantially says : These appraisers were constituted a board for the performance of duties of a *public, deliberative* and *judicial* nature, and it may be safely said that any duty of an aggregate organ of the government may be performed by a majority of its members where the constituting power has not expressly required a concurrence of the whole, and further, " that it is not to be supposed that the functions of the board would be suspended, to the detriment of the public, by the loss of one of its members." And herein lies the important distinction between a mere private agency, and a public aggregate agency charged with the duty of exercising a governmental function. If one of several persons to whom is confided the execution of a private trust refuses to join with the others, or if, after his appointment and before the execution of the trust, he dies, the business may be put off till another time. Not so with public business of a deliberative or judicial character. It

cannot be deferred to a more convenient season. By necessity, prompt action is required. The law exacts it. The public weal demands it. The framers of the Constitution and the people who adopted it, we think, did not intend, by the manner in which the board was formed, to place it in the power of one member to prevent its sitting.

The equalization officers by the organic law are constituted a board *eo nomine*. They act as a *board*, as an aggregate body, and not as individuals. If the legitimate operations of the fiscal department of the State can be defeated by one member of the State board, either through obstinacy, sickness or for mere partisan or other purposes, then indeed does our revenue system, so far as relates to the equalization and adjustment of State taxes, rest upon a precarious foundation. Nothing less than the clear, express intention of the law-making powers, in the silence of the Constitution, that *all* the members of the board must meet and confer, would, in our opinion, warrant us in holding that the action of the majority of the whole number is not the action of the board where every member had an opportunity by *due notice* to attend its meeting. Authorities, in addition to those above cited, are not wanting to show that where a public duty is cast by law upon a board a majority may act. *Caldwell* v. *Harrison*, 11 Ala. (N. S.) 755; *Sprague* v. *Bailey*, 19 Pick. 436; *Commissioners* v. *Lecky*, 6 Serg. & Rawle, 165; *Jewett* v. *Alton*, 7 N. H. 253; *Cooley* v. *O'Connor*, 12 Wall. 398.

Were all the members of the board duly notified? The statute requiring the board to sit at the office of the secretary of State at the capital, on the second Monday of August of each year, was *notice* to all the members of the board. Section 2281, General Laws.

The respondent failing to deny, except inferentially, in the third defense admits that the subsequent meetings were held pursuant to adjournment. At an adjourned meeting any business may be transacted that might have been transacted at the stated meeting. It is, in fact, but a con-

tinuation of the stated meeting. Dill. on Mun. Corp. 223, 224, 225.

As all the members of the board were notified and a majority attended, the action of that majority was not invalid on account of the failure of other members to attend.

We come now to the consideration of a question which vitally affects the public welfare. The answer alleges in substance that the auditor of State, State treasurer and attorney-general, assuming to be and to act as the State board of equalization, increased the aggregate valuation of the real and personal property over and above the valuations as returned by the clerks of the following counties as follows:

| | |
|---|---:|
| The county of Arapahoe | $960,255 90 |
| The county of Bent | 224,038 45 |
| The county of Boulder | 630,654 70 |
| The county of Douglas | 305,389 60 |
| The county of Elbert | 409,008 95 |
| The county of El Paso | 383,818 90 |
| The county of Gilpin | 55,025 00 |
| The county of Huerfano | 12,538 14 |
| The county of Jefferson | 547,979 05 |
| The county of Lake | 272 85 |
| The county of La Plata | 5,962 50 |
| The county of Larimer | 305,330 85 |
| The county of Las Animas | 24,648 93 |
| The county of Park | 11,303 00 |
| The county of Pueblo | 644,332 70 |
| The county of Rio Grande | 2,694 50 |
| The county of Routt | 49,206 50 |
| The county of Saguache | 28,568 73 |
| The county of Summit | 408 72 |
| The county of Weld | 889,545 20 |
| | $5,490,993 32 |

That at the same time the board diminished the aggregate valuations of the following counties, as follows :

| | |
|---|---|
| The county of Conejos ........................ | $1,852 20 |
| The county of Costilla........................ | 5,287 00 |
| The county of Custer......................... | 28,834 05 |
| The county of Fremont....................... | 15,617 00 |
| | $49,590 85 |

That they made no changes of the valuation of the property of the other counties of the State.

That the net increase of the aggregate valuation of all the counties of the State above the aggregate valuation as returned by the clerks of the several counties was five millions four hundred and forty-one thousand four hundred and two and 47-100 dollars ($5,441,402.47).

Was it in the power of the board of equalization to thus increase the aggregate valuation of the real and personal property of the State above the aggregate valuation as returned by the clerks of the several counties ?

Taxes are defined as being the enforced proportional contribution of persons and property levied by authority of State for the support of the government and for all public needs.

They are the property of the citizens demanded and received by the government, that it may be enabled to perform its essential functions. The demand is founded on the reciprocal duties of protection and support existing between the State and its citizens. Protection of life, liberty and property is the citizen's return. The sovereignty of the State within its limits secures their enforcement. Their levy and collection is one of the highest acts of supreme power, in that it takes the property of the citizen by processes of necessity more or less summary and but *quasi*-judicial.

History is full of its abuses, and American constitutions, statutes and decisions show with what jealous solicitude and care the power has been viewed and guarded. Limited by

the people in their Constitution to specified purposes and within fixed rates, the mode and manner of its exercise prescribed and settled by statutory enactment, the power wherever found, whether in constitution or statute, must still be strictly construed by the judiciary. Thus at this point of danger to the citizen, the genius of our laws has stationed the triple guard of constitutional limitation, statutory regulation and judicial interpretation.

Any injury, then, involving the legality of a tax proceeding must be conducted in reference to these general principles, keeping in view that revenue is essential to the existence of the State, and that its collection in accordance with the mode prescribed by law, and in that mode only, is essential to the preservation of the rights of the citizen.

The question here presented is one touching the powers of the State board of equalization. Section 15, article 10 of the Constitution provides as follows: "There shall be a State board of equalization, consisting of the governor, State auditor, State treasurer, secretary of State, and attorney-general. * * * The duties of the State board of equalization shall be to *adjust* and *equalize* the valuation of real and personal property among the several counties of the State."

The purpose of the creation of this board is imported in its title; its duties, as stated in terms in the Constitution, are to "*adjust* and *equalize* the valuation of real and personal property among the several counties of the State." Perfect equality in the assessment of taxes is unattainable, approximation to it is all that can be had.

The object of the provision is to apportion as equitably as may be the burthen of the State government among the several counties, to prevent a disproportionate share of the State tax from being thrown upon any county or counties by reason of the action of the local assessors. The grossest inequality might prevail in the valuations in the different counties, and possibly with reference to escaping a fair proportion of the State tax, and without a power lodged somewhere to adjust and equalize the several county valuations,

the greatest injustice might be done, and there would be a practical annulment of the constitutional provision that " all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." It was to meet this difficulty and accomplish this end that the State board of equalization was created with powers to *adjust* and *equalize.* For this purpose the board is required by statute (General Laws, § 42, p. 756) to " examine the various assessments as far as regards the State tax, and equalize the rate of assessments in the various counties whenever they are satisfied that the scale of valuation has not been adjusted with reasonable uniformity by the different assessors." By section 43, the board is required to ascertain whether the " valuation of real estate in each county bears a fair relation or proportion to the valuation of all other counties of the State, and on such examination they may increase or diminish the aggregate valuation of real estate in any county as much as in their judgment may be necessary to produce a just relation between all the valuations of real estate in the State, but in no instance shall they reduce the aggregate valuation of all the counties below the aggregate valuation as returned by the clerks of the several counties." Under these sections it is claimed that the board has the power to increase the aggregate valuation of the real and personal property of the State over and above the aggregate valuation as returned by the clerks of the different counties.

This claim if well founded makes them practically a board of assessors, with power to fix and determine values as well as to adjust and equalize valuations.

In all cases of taxes by valuation an assessment is indispensable and primary. It lies at the foundation of the proceeding. The term as commonly employed embraces both the listing of taxable property and the determination of its value. This assessment is not only indispensable, but in making it the provisions of the statute under which it is made must be observed with particularity. If this were not compulsory; if the officers were at liberty to disregard im-

portant provisions of the statute in this initiatory step, the chief protection which the law has intended for individuals in tax cases would be removed.   Cooley on Taxation, p. 259–60.

Our statutes provide (General Laws, p. 742, § 4) that "all property, both real and personal, within the State, not expressly exempt by law, shall be subject to taxation." They further provide (General Laws, p. 747, § 14) that "all taxable property shall be listed and valued each year, and shall be assessed at its full cash value." Let us then inquire where, under our Constitution and laws, this important power of determining the valuation of taxable property as a basis of taxation is lodged.

The Constitution provides (§ 8, art. 14) for the election in each county, each alternate year, of a county assessor. He is thus a constitutional officer, and though his duties are left unprescribed, the essential duties of an assessor must be presumed to have been contemplated.   Is there not here a plain intention on the part of the people to preserve local control over the valuation of property for purposes of taxation?   This local control existed under the territorial form of government under which they had been living, and is this not an effort to secure it beyond contingency?   In view of this provision and of other constitutional limitations it may be gravely doubted whether it is competent for the legislative authority to take from county assessors the substantial control of valuations of property for State taxation, and vest it in a central authority.   The question here presented is not what the legislative authority could do in this respect, but what it has done.

Following the provisions of the Constitution our statutes (General Laws, § 121, p. 247) provide for the election of a county assessor in each county of the State who shall give bond to the people of Colorado and subscribe an oath for the faithful performance of his duties as assessor.

Section 25 (General Laws, p. 750) requires the county commissioners of each county to furnish the assessors suit-

able blank forms for assessment, and such instructions as shall be necessary to secure full and uniform assessments and returns.

Section 21 (General Laws, p. 749) requires the assessor to leave with each resident of his county, etc., a notice requiring him to make out and return to the assessor a list of his property subject to taxation, and to leave him a blank form upon which the list may be made. This return by another section is to be under oath.

Section 23 (General Laws, p. 750) provides for the valuation of certain property by the owners.

Section 32 (General Laws, p. 753) provides that all property shall be valued by the assessor, except such as may be required to be valued by the owner, in section 23 of the act.

Section 11 (General Laws, p. 744) provides that the assessor shall assess all personal property situate or being in his county.

Section 27 (General Laws, p. 751) provides for the assessor to assess in case of failure of owner to give in his list according to law.

Section 33 (General Laws, p. 753) provides for the delivery of the assessment roll by the assessor to the county clerk.

Section 37 (General Laws, p. 754) provides an oath to be taken by the assessor and attached to the assessment rolls, to the effect that he has made diligent inquiry and examination to ascertain all property within his county subject to taxation ; that he has assessed it equally and uniformly according to his best judgment and information and belief at its full cash value; that he has faithfully complied with all duties imposed on the assessor by the revenue laws ; that he has not imposed any unfair assessment through malice nor allowed any one to escape a just and equal assessment through favor.

Section 38 (General Laws, p. 754) provides that the county commissioners of each county shall constitute a board of equalization for the correction and completion of the assessment rolls, with power to supply omissions in the

assessment rolls, and for the purpose of equalizing the same, to increase, diminish or otherwise alter and correct any assessment or valuation.  It provides in case of change of the assessment of any tax payer, that he shall be notified and have a hearing before the board.  It constitutes them a *quasi* court to hear any and all complaints of the tax payer touching the valuation or listing of his property, with full power to adjust and correct the assessment roll as in their judgment they may deem proper and right, thus adding statutory duties to their constitutional duty " to adjust and equalize."  Other sections of the law might be cited, but those mentioned suffice for our purpose.  We find here a complete system with well-defined and minutely prescribed rules and regulations guarding the property right of the citizen ; guarding equally the revenue necessities of the State, acting through the instrumentalities of owners and the assessors chosen by the electors of the several counties, listing, valuing, and returning taxable property under the sanction of an oath, with the board of county commissioners acting as a board of appeal and review, all for the one purpose of ascertaining, determining and fixing the value of taxable property in each county of the State as a basis of taxation.  The statute provides for the transmission of these assessment rolls of the county to the board of equalization and contemplates that one assessment shall be made for both State and local taxes.

The only exception to this that we find is the express provision for the assessment of railroad property by the State board of equalization.  For this, in the opinion of the legislature, there was, doubtless, an obvious necessity and authority, found in the last clause of section 15, article 10 of the Constitution, which provides that the board shall perform such other duties as shall be prescribed by law.  The assessor is thus made an integral part of the revenue system which not only thus specifies and defines his duties, but assigns to other officers and boards equally well-defined and separate duties.  The assessor shall list and value.  The board of commissioners shall equalize, adjust, increase

and diminish, supply omissions and correct errors and hear complaints. The county clerk shall prepare assessment rolls and compute and extend the tax therein. The State board of equalization shall adjust and equalize valuations, and lastly, the county treasurer shall collect the tax. In seeking for legislative intent, reference must be had not only to the form and phraseology of the particular section under consideration, but any part must be viewed in connection with the whole, so if possible to harmonize and give effect to the whole.

Looking then to the provisions of the Constitution and the statute, we are clearly of the opinion that the power to fix and determine the valuation of taxable property is lodged by them in the assessor and the board of county commissioners of the several counties of the State, and that when they have under the law performed this duty and exercised this power, that the sum of the valuations of the several counties so by them found must be taken as the aggregate valuation of all the property in the State, and is conclusive and final as against the State board of equalization. The State board may, for the purpose of adjusting and equalizing, increase the aggregate valuation of one county, and decrease the aggregate valuation of another, but they have no power to increase the sum of all the valuations of the several counties of the State. That aggregate valuation has been found for them, and fixed by the authority and in the mode prescribed by the law. This view is not only sanctioned by the force of the general provisions of the statute considered as a whole, but also by the phraseology of the sections under consideration. The board is to adjust and equalize the valuation. This term *valuation* here imports values already estimated and fixed and must be referred for the measure of its force and meaning to the mode prescribed by law for estimating and fixing valuations. The aggregate material with which the board can deal is thus limited ; they may adjust and equalize it among the several counties, but they cannot add to its volume.

It is claimed that in that the statute prohibits the board from decreasing "the aggregate valuation of all the counties below the aggregate valuation as returned by the clerks of the several counties" (General Laws, p. 756, § 43), the power to *increase* must be implied.

A power so vast and important, involving the integrity of constitutional limitation, cannot be founded on an implication of law. A statute in derogation of the rights of property, or which takes away the estate of the citizen, must be strictly construed. *Sharp* v. *Spier*, 4 Hill, 76 ; *Bloom* v. *Burdick*, 1 id. 130.

Section 11 of the Constitution is as follows : "The rate of taxation on property for State purposes shall never exceed six mills on each dollar of valuation, and whenever the taxable property within the State shall amount to one hundred million dollars, the rate shall not exceed four mills on each dollar of valuation, and whenever the taxable property within the State shall amount to three hundred million dollars, the rate shall never thereafter exceed two mills on each dollar of valuation, unless a proposition to increase such rate, specifying the rate proposed, and the time during which the same shall be levied, be first submitted to a vote of such of the qualified electors of the State as in the year next preceding such election shall have paid a property tax assessed to them within the State, and a majority of those voting thereon shall vote in favor thereof in such manner as prescribed by law."

If this claim of power on behalf of the State board to increase the valuation be admitted, why limit in the Constitution the per cent that it may levy? It matters little whether the limitation be one mill or ten, if increase of valuation be unrestrained. Limited upon the one hand, it is unlimited upon the other. We may neither calculate its extent nor challenge its pretensions. Over five million dollars increase this year — it may be over fifty million dollars increase the next.

Under this construction of the statute the efforts of the

people to establish and maintain legitimate restraints on the power to tax will have been unavailing, and the checks and guards which they have embodied in their Constitution to that end, cease to be of practical force or value. The spirit of the law and not "the letter which destroys" must prevail. We cannot believe that any such grant of power to the State board of equalization was within the intent of the legislative authority.

We are, therefore, of the opinion that the board of equalization in making the increased valuation acted without authority of law, and that their action in this respect is void.

Every county, the aggregate amount of whose valuation was increased, must be presumed to have been assigned some portion of this added burthen of taxation. The county of Arapahoe comes within this class, and the defense of the respondent must be held good.

Upon the question of the levy of the State tax by the board of county commissioners before the county clerk could be called upon to compute and carry out the tax on his rolls, upon which counsel were heard at chambers after the argument in chief, we are of the opinion that no levy was necessary on the part of the board of commissioners. Section 2283 (General Laws, p. 756) provides that "on or before the first day of September, in each year, the auditor shall transmit to the clerk of each county a statement of the changes, if any, which have been made in the assessment, and the rate of State tax which is to be levied and collected within his county, which, however, shall not exceed three mills on a dollar of the valuation, and when the board fixes no different rate, or if, for any reason, the board fail to sit, or the county clerk should fail to receive the statement of the rate of tax ordered by them, that rate shall be deemed to be levied, and the clerk of each county, in making up the tax list required by this act, shall compute and carry out, in the proper column, a State tax at the rate aforesaid; provided, however, that for the year 1877, the

rate of taxation shall be for State purposes five mills on the dollar, unless the State board of equalization shall fix a different rate."

In this section the intention of the legislature is evident, to provide against contingencies that might defeat and leave unprovided the State revenues. The force of the section is to levy, by legislative declaration, a State tax for the year 1877, of five mills on each dollar of valuation in any one or more of the following cases: (1) Where the board fixes no different rate; (2) where, for any reason, the board fail to sit, or what, in our opinion, is the same thing, where for any reason its sitting shall prove ineffectual; (3) when the county clerk shall fail to receive the statement of the rate of tax ordered by the board.

Upon the happening of any one or all of these contingencies the law intervenes and makes the levy, and it becomes the duty of the clerks of the several counties in making out the tax list, in the language of the statute, to "compute and carry out in the proper column a State tax" at the rate fixed by law. As the record discloses that no different rate was fixed by the board, and as in our mind no valid changes were made by it in the valuations of the different counties, this levy must be computed upon the valuations as returned by the clerks of the several counties as the basis of the tax.

Whether if a different rate had been fixed by the board, it would have been necessary, in view of the provisions of section 2284, for the board of county commissioners to make a levy, it is not necessary for us to determine.

The demurrer, except as to the irrelevant, redundant and immaterial matter of the answer, which we have ordered stricken out, is overruled.

*Demurrer overruled.*