[No. 8866.]

## THE PEOPLE EX REL. V. PITCHER.

1. PLEADING—*Aider by Pleading Over.* Mandamus against the County Assessor to compel obedience to an order of the State Board of Equalization directing an increase in the valuation of certain property in his county. The return averred that the Board of Equalization, in their action relied entirely upon the report of the Tax Commission, that its action was arbitrary, capricious, and mere guess work. A demurrer to this return was overruled, and the people answered. *Held* the objection to the return was not waived by the answer. (156.)

2. STATE BOARD OF EQUALIZATION—*Orders—Effect.* The board when duly convened at the time and place appointed by law is a *quasi* court. Its determinations have the effect of a judgment, which all inferior officers of the taxing service must obey. In mandamus to enforce such order, against a ministerial officer upon whom the duty to obey is imposed by law, no inquiry into the regularity of the proceedings of the board is permitted. (157.)

Under the amendment to section 15 of article X of the constitution adopted in 1914 (Laws 1915, c. 55) the Board of Equalization is the final arbiter in the valuation of property for the purpose of taxation. It may adjust, equalize, lower or raise, the valuation of any and all properties, or any item of such property, to the full cash value thereof; and the action of the County Boards of Equalization is subject to its revision. (168, 169.)

The action and reports of these bodies, as well as those of the Tax Commission should be accepted as persuasive, though, whether proper or improper, they are not conclusive. (172.)

If the State Board of Equalization adopts the action of the Tax Commission it thereby confers upon it validity, even though, through some failure on the part of the Tax Commission, it was, before such adoption, without validity. (173.)

Errors in these proceedings, or mistake in its conclusions, can be assailed only by some direct proceeding by a party in interest.

The constitutional provision is self-executing, and no legislation is required to its enforcement. (170, 177.)

3. COUNTY ASSESSOR—*Duties and Powers.* When the County Assessor has transmitted to the Tax Commission the abstract of his assessment his *quasi*

judicial functions are at an end. His duties thereafter are purely ministerial. The orders of other administrative boards acting with jurisdiction cannot be questioned by him. (157.)

4. MINISTERIAL OFFICER—*Duty to Obey Those in Superior Authority.* It is the imperative duty of a ministerial officer to obey the orders of those by law in authority over him; without making question of the validity of such orders, and this, whether the direction be embodied in a statute, or the pronouncement of a governmental agency invested with power in the premises. He may not question the constitutionality of the statute under which the superior authority proceeds, or complain that other citizens may be injuriously affected thereby. He is protected by the law in obeying the mandate of those set over him.

His only concern is to see that such mandate proceeds from competent authority. (158.)

5. MANDAMUS—*To Enforce a Tax—Defenses.* The respondent may defend on the ground of satisfaction, impossibility, or want of jurisdiction; but to plead irregularities in prior proceedings, another remedy, or a custom not authorized by law, is no return. (157, 158.)

6. TAXATION—*Assessment.* The duties and authority of the county assessor, under the statute, defined.

The Tax Commission in the case of property improperly omitted from the roll by the assessor, may, on notice to the owner, make an original assessment thereof. Rev. Stat., sec. 5636, Laws 1911, c. 216, secs. 8, 13, Laws 1913, c. 133. (171.)

7. —— *What Evidence of Value Required.* Those who make original assessments act largely upon their own knowledge and judgment; and Boards of Equalization, are not required to examine witnesses, or act upon any particular kind or quantum of evidence. They may proceed in their own way, acting upon any evidence which satisfies them. (174.)

8. —— *Notice to Property Owner.* The requirement that an administrative board having control of the valuation of property for taxation shall meet, for the performance of their duties, at a specified time and place, is notice to the property owner, and all the notice to which he is entitled. (171.)

*Error to Denver District Court.* Hon. JOHN A. PERRY, Judge.

Hon. FRED FARRAR, Attorney General, Mr. NORTON MONTGOMERY, Assistant Attorney General, for The People.

Mr. JAMES A. MARSH, City Attorney, Mr. GEORGE Q. RICHMOND, Mr. C. L. AVERY, for defendant in error.

WHITE, J., delivered the opinion of the court.

Upon petition of the People, ex rel. The State Board of Equalization and the Colorado Tax Commission, the District Court issued an alternative writ of *mandamus* directed to Clair J. Pitcher as Commissioner of Finance and *ex-officio* Assessor of the City and County of Denver, commanding him to make such additions or corrections in the assessment roll of his county for the year 1915 as necessary to carry out the directions of the State Board of Equalization and the Colorado Tax Commission, to put said property therein listed on the assessment rolls for taxation purposes at its full cash value, or to show cause within a designated day why he had not done so. To the alternative writ respondent made return or answer, to which the People interposed a demurrer. The demurrer was overruled, and thereupon the People filed a reply to the return of respondent. A hearing was had, the writ quashed and the cause of action dismissed, whereupon the People brought the matter here for review on error.

The essential facts are as follows: The assessors of the several counties of the State, on or before the first day of September, 1915, in accordance with the law, transmitted to the Colorado Tax Commission their respective abstracts of assessment for such year, showing the real and personal property assessed by them in their respective counties, and their valuation thereof. The abstract so prepared and transmitted by respondent showed the aggregate value of property listed and assessed by him and taxable within the City and County of Denver to be $265,337,910. September 16, 1915, the Tax Commission transmitted to the County Board of Equalization of the City and County of Denver a communication wherein it recommended a designated increase of valuation on the taxable property in such county, and that such increase be placed upon certain named items or classes of property. This was not done, however, and thereafter on the first day of October, 1915, the Tax Commission, with all of the abstracts of assessment from the

various counties of the state before it, "found and determined the amount of increase or decrease in the valuation of said real and personal property of the respective counties which would place said property on the assessment roll at its true cash value." The Tax Commission thereupon made a report of its actions and findings, and on October 4, 1915, transmitted the same to the State Board of Equalization, then in session, at the time and place as required by law, for the purpose of performing the duties imposed upon it by virtue of the provisions of section 15 of art. X of the Constitution, as amended in 1914, chap. 55, pp. 163, 164, S. L. 1915. This report, as far as it relates to the City and County of Denver, and omitting the caption and signature, is as follows:

"Pursuant to the provisions of sections 31, and 32, of Chapter 216, Session Laws of the State of Colorado, 1911, the Colorado Tax Commission herewith, submits the following to the State Board of Equalization:

For the year 1915 the various county assessors returned an assessment of property under their jurisdiction of $921,591,301. The Colorado Tax Commission having carefully examined the abstracts as returned, and made a study of data available, recommended to certain of the county boards of equalization that increases in valuation aggregating $67,754,753, be placed upon certain classifications of property. Upon these recommendations increases in the aggregate amount of $10,639,767 were made by certain boards, making an aggregate assessment of $932,231,068. This Commission has raised these amounts $57,114,986, making an aggregate of $989,346,054.

The amounts that were added to the local assessments of real and personal property in each of the various counties were as follows:

Denver, $55,408,952, as follows:

| | |
|---|---:|
| Improved land | $    840,376 |
| Imp. on improved land | 547,171 |
| Town and city lots | 25,548,128 |
| Imp. on lots | 20,549,953 |
| All other animals | 2,862 |
| Automobiles | 590,768 |
| Musical instruments | 389,232 |
| Clocks and watches | 34,965 |
| Harness | 11,822 |
| Machinery and equipment | 626,434 |
| Money invested in merchandise | 812,083 |
| Capital in manufactures | 30,548 |
| Jewelry | 129,461 |
| Household property | 1,660,328 |
| Libraries | 49,801 |
| Furniture and fixtures | 470,228 |
| All other property | 114,794" |

The State Board of Equalization continued in session from day to day, pursuant to adjournment, until and including the 18th day of October, 1915, on which date, by resolution duly adopted, it fixed the valuation of the real and personal property of the City and County of Denver at $320,-746,862, instead of $265,337,910, the amount returned by the assessor in his abstract of assessment, "making an increase in valuation of $55,408,952." At the same time and place it further provided by resolution that the aforesaid increase in valuation should be placed upon certain designated classes and items of classes of property in such county. Thereupon a certified notice of its action in the premises was delivered to, and received by, respondent, who refused to make the increase or comply with the orders of the board. The material portions of this notice are as follows:

" * * * that at a meeting of the State Board of Equalization, held on the 18th of October, 1915, which meeting was held for the purpose of examining the abstracts of

assessment of the various assessors of the state for the year 1915, as submitted to said board by The Colorado Tax Commission, and for the purpose of taking action on said abstracts and of adjusting, equalizing, raising or lowering the valuation of real and personal property of the several counties of the state and the valuation of any item or items of the various classes of such property, all done in the manner as provided by law, and for the further purpose of fixing the rate of tax to be levied and collected within the various counties of the state for state purposes, the following proceedings, among others, were had:

By resolution, duly adopted, the valuation of the real and personal property of your county was increased from $265,337,910, the amount returned in your abstract of assessment on property assessed by you, to $320,746,862, making an increase in valuation of your assessment of $55,408,-952, the rate per cent of said increase being.

Said resolution also provided that said increase in valuation of your assessment should be distributed as to the various classes or item or items of classes of property in your county in the following manner:"

(There is here inserted in the notice a duplicate of the classes and items of property and the respective values shown above in the report of the Tax Commission to the State Board of Equalization.)

The answer of respondent questions the right of relators to prosecute the action; sets forth respondent's lack of knowledge as to whether the Tax Commission examined the abstracts of assessment of the various counties of the state, or secured any information for the purpose of determining whether the property of the several counties had been properly assessed; alleges that the assessment made by respondent placed the property of the City and County of Denver upon the assessment roll at its full cash value; that the increase in the assessed valuation on property in the

City and County of Denver, and the findings and report in relation thereto of the Tax Commission to the State Board of Equalization "were made arbitrarily, capriciously and unlawfully, and as a matter of guess or chance, and without the exercise of any method or system whatever," in that it was made "solely upon the findings and report made" to it by the Tax Commission, and that while such board heard some, including respondent, it refused to hear other witnesses in relation to the matter; admits that the Tax Commission submitted its report to the State Board of Equalization; that the latter body met at the time and place and for the purpose of performing its duty under the law; that it acted in regard thereto, and notified the assessors of the state, including respondent, of its determination in the premises; alleges that Chapter 216 of the Session Laws of 1911 is unconstitutional, and that the action of the State Board of Equalization is in violation of both the Federal and State Constitutions.

Upon the hearing of the demurrer which questioned the sufficiency of the facts set forth in the return to constitute an answer or defense to the writ, the court held, that the State Board of Equalization had the power to raise or lower the valuation of any part or parcel whatsoever of the property of any county to bring such property therein to its full and true cash value, for the purpose of taxation, and while such board had no right to go above such value, yet, a court cannot, upon such question, substitute its judgment for that of the board, but may set aside its act in that regard if such board reached its conclusions without using its judgment, that is, "arbitrarily and capriciously"; and as the return to the writ denied that the Tax Commission secured any information concerning the full cash value of property assessed, and alleges that the State Board of Equalization relied soley and entirely upon the report of the Tax Commission as to values in the various counties, and its acts

in the premises were arbitrary and capricious, by guess or chance, without any proper method or system, that the return was "sufficient to call for a traverse of the allegations of caprice, guess or chance," and overruled the demurrer. Thereupon the People filed a reply putting in issue the aforesaid allegations, which the court had held it was necessary to traverse. The People here contend that as the alternative writ stated facts sufficient to constitute a cause of action and, *prima facie,* entitled them to the relief therein demanded, and the answer or return of respondent failed to show any interest in respondent that would authorize him to raise the questions set forth in his answer, and it affirmatively appeared therefrom that he is a ministerial officer, and the duties required by the writ to be performed by him are ministerial in their character, it wholly failed to set forth facts sufficient to constitute a defense to the alternative writ. These objections were not waived by answering over, and may be interposed at any time, and having been urged both in the court below and here, we shall consider them.

1.   While it may be true that a valuation imposed upon property for purposes of taxation by tax officials in a capricious or arbitrary way, through chance and guess, and without exercising any judgment in the premises, may and should, if such irregularities have not been waived by the property owners affected, be set aside and annulled by a court, it can only be done in an appropriate proceeding. An examination of the case of *Consolidated Gas Co. vs. Mayor,* 101 Md. 541, 61 Atl. 532, 1 L. R. A. (N. S.), 263, 109 Am. St. 584, and cases there cited, relied upon by the trial court for its holding in overruling the demurrer herein, are cases under statutes providing for appeals to the courts from the action of tax-assessing and equalizing tribunals, or reviews thereof under *certiorari,* or by direct proceedings in equity, when fraud is alleged and established, and always by and

upon the relation of parties affected directly by the action
of such governmental agencies or tribunals.   If it be true
(as held by the court in overruling the demurrer), that the
State Board of Equalization has the power to "raise or
lower the valuation of any part or parcel whatsoever of the
property of any county," then when duly convened for the
purpose of such duty, at the time and place appointed by
the law for that purpose, it enters an order fixing the values,
that order is necessarily conclusive in a collateral proceed-
ing such as this, unless something appears on the face of
such order disclosing its invalidity.   The Board of Equal-
ization when so acting is a *quasi* court invested by the con-
stitution with the duty to ascertain and determine certain
facts, and its determination thereof is a judgment.   In
mandamus proceedings to enforce that judgment against a
ministerial officer, whose duty to obey it is imposed by law,
no inquiry into its regularity can be permitted.   *People, ex
rel. v. Rio Grande Co.,* 7 Colo. App. 229, 236, 237, 238, 42
Pac. 1032; *Bd. of Co. Com. of Rio Grande Co. v. Burpee,*
24 Colo. 57, 48 Pac. 539.

   After respondent had completed his assessment and
submitted his assessment roll to the County Board of Equal-
ization,—§ 5658 R. S. 1908,—and transmitted his abstract
of assessment to the Colorado Tax Commission,—§ 30, p.
622, S. L. 1911,—his *quasi* judicial functions were ended,
and his duties thereafter to be performed were purely minis-
terial, and that which is subsequently done by other boards,
with jurisdiction to act in the premises, cannot be changed
or questioned by him.—*Denver vs. Pitcher,* 54 Colo. 203,
224, 225, 129 Pac. 1015; *Colo. Tax Com. vs. Pitcher,* 56 Colo.
343, 383, 138 Pac. 509, § 33, p. 623, S. L. 1911; Cooley on
Taxation (3d ed.), p. 1359.

   Indeed, the rule seems universal that "when manda-
mus is resorted to in order to compel the assessment or
collection of taxes the respondent may defend upon the

ground of satisfaction, impossibility, or want of jurisdiction. But it is not a good return to plead irregularities in prior proceedings, another remedy, or a custom not authorized by law." 13 Encyc. of Plead. & Prac., p. 743.

It is the imperative duty of a ministerial officer to obey the act of a tribunal invested with authority in the premises directing his action; not to question or decide upon its validity. This applies with the same force whether the direction be embodied in a legislative act or in the pronouncement of a governmental agency invested with power in the premises. The maxim lies at the very foundation of jurisprudence, and without its observance government would cease to exist.

The rule has been frequently declared by this court. Thus in *People, ex rel. vs. Lothrop,* 3 Colo. 428, 451, we held that the only question that could be raised by an assessor, after the State Board of Equalization had acted, was the question of constitutional or statutory jurisdiction. The language used is as follows: "The board was the sole judge as to what was necessary to the proper adjustment and equalization of the tax so long as it acted within its constitutional and statutory jurisdiction. This court can only inquire whether it did so act within the limits of its authority."

Equally pertinent is our language in *Ames vs. People,* 26 Colo. 83, 90, 56 Pac. 656, 658, as follows: "The reasons for this rule are apparent. Public policy and public necessity require prompt and efficient action from such officers, and when intrusted with the assessment of taxes and the collection and disbursement of revenue, they had no right to refuse to perform ministerial duties prescribed by law because of any apprehension on their part that others may be injuriously affected by it, or that the statute prescribing such duties may be unconstitutional. Individuals who might. be injuriously affected may not doubt the constitutionality

of the law, or may waive their rights, or in person choose to test the validity of the enactment."

In *State, ex rel. vs. Buchanan*, 24 W. Va. 362, it is, expressly held that if a tribunal or governmental agency has the jurisdiction to determine a given question and does so, obedience thereto by ministerial officers acting in relation to the matter covered by the order, is imperative; and they may not pause in the execution of their duty to question the regularity of the proceedings of the superior tribunal in arriving at its conclusion, or because they apprehend that others may be injuriously affected thereby. In that case the auditor of the state was authorized to give such lawful instructions to the assessors respecting their duties as may seem to him judicious. The Constitution required equality and uniformity of taxation, and that all property should be subject to taxation, except the legislature was authorized to exempt therefrom certain classes of property. It attempted to exempt from taxation property not included within the excepted class. The Supreme Court of the state had theretofore held, under a prior Constitution containing substantially the same provision in that regard, that the act of the legislature extending the exemption to other classes of property was invalid. The auditor was requested by the governor to instruct the assessors in their assessments to disregard the legislative provision which attempted to exempt from taxation property not within the class mentioned in the constitutional exception. This the auditor did, and a certain assessor, refusing to obey, the auditor resorted to mandamus to coerce him to comply with the order. It was held that the governor, in the first instance, had jurisdiction to determine that the apparent legislative provision was not law, and that the order of the auditor was valid, and that the assessor could not arrest the execution of the law as construed by the chief executive, or justify his insubordination, on the ground that the governor had decided wrongly, or

that the tax was illegal or invalid; that it was the assessor's duty to obey the instructions of his superior as to what property was subject to taxation, and could not shield himself by denying the legality of the instructions of the auditor. In the course of the opinion it is said on page 378: "No one will question the principle, that all inferior officers of courts in all cases, where the court has jurisdiction, are bound to obey the order or mandate of the court, and if the inferior officer so ordered, refuse to obey, he will be punished. If the legislature within its jurisdiction, orders a thing to be done by the sergeant-at-arms of either house, the thing must be performed without question, or the inferior officer will be punished for disobedience." So, in the case at bar, if the State Board of Equalization had jurisdiction to "raise or lower the valuation of any part or parcel whatsoever of the property of any county," and did so, all inferior officers in relation to that matter must obey the order or mandate of that tribunal.

In *People vs. Collins,* 7 Johns. 549, a mandamus was prayed to require the defendant, a town clerk, to record a survey of a highway; and in his return he insisted that the survey was illegal. The court, speaking through KENT, C. J., p. 553, said: "It certainly did not lie with the defendant, as a mere ministerial officer, to adjudge the act of the commissioners null. It was his duty to record the paper; *valeat quantum valere potest.* It was enough for him, that those persons had been duly elected commissioners within the year, and were in the actual exercise of the office."

In *Smyth vs. Titcomb,* 31 Me. 272, 286, it is said: "A public officer entrusted with the collection and disbursement of revenue, in any of the departments of the government, has no right to refuse to perform his ministerial duties, prescribed by law, because he may apprehend that others may be injuriously affected by it, or that the law may, possibly, be unconstitutional. He is not responsible for the law, or

for the possible wrongs which may result from its execution. He cannot refuse to act, because others question his right. The individuals to be affected may not doubt the constitutionality of the law; or they may waive their supposed rights or wrongs; or may choose to contest the validity of the enactment, personally. Public policy, as well as public necessity and justice, require prompt and efficient action from such officers. The state, counties, towns and school districts, must be supplied, in order to accomplish the purposes of their organizations, and the proper officers, in their respective departments, must seasonably furnish the authorized amounts. The consequences would be ruinous if they could withhold their services, and the necessary means, either from timidity, or captiousness, until all questions of law, which might arise in the performance of their official duties, should first be judicially settled."

Certain language of the court in *People vs. Salomon,* 54 Ill. 39, 45, 46, is so pertinent to the matters involved herein that we shall quote the same. The facts of the case were a clerk of a County Court refused to extend upon the collector's books the taxes according to the increased valuation determined by the State Board of Equalization, and proceedings were instituted to compel the clerk by mandamus to make such extension, which resulted in the award of a peremptory writ. The clerk still refused to perform his duty in the premises, and in sustaining an attachment against him for contempt the court, directly addressing him, said: "The law under which this additional tax was imposed, had passed the legislature under all the forms of the Constitution, and had received executive sanction, and became, by its own intrinsic force, the law to you, to every other public officer in the state, and to all the people. You assumed the responsibility of declaring the law unconstitutional, and at once determined to disregard it, to set up your own judgment as superior to the expressed will of the

legislature, asserting, in fact, an entire independence thereof. This is the first case in our judicial history, in which a ministerial officer has taken upon himself the responsibility of nullifying an act of the legislature for the better collection of the public revenue—of arresting its operation—of disobeying its behests, and placing his own judgment above legislative authority expressed in the form of law.

To the law every man owes homage, 'the very least as needing its care, the greatest as not exempted from its power.' To allow a ministerial officer to decide upon the validity of a law, would be subversive of the great objects and purposes of government, for if one such officer may assume infallibility, all other like officers may do the same, and thus an end be put to civil government, one of whose cardinal principles is, subjection to the laws.

Being a ministerial officer, the path of duty was plain before you. You strayed from it, and became a volunteer in the effort to arrest the law, and it was successful. Had the property owners, who were subjected to this additional tax, considered the law unconstitutional, they could, in the proper courts, have tested the question, and it was their undoubted right so to do. Your only duty was obedience. The collected will of the whole people was embodied in that law. A decent respect to them required that all their servants should obey it."

The respondent herein has no more interest in that which some other tribunal did within its jurisdiction relating to the matter of fixing values for the purposes of taxation than the treasurer. The treasurer, upon receiving a warrant from the proper authorities to collect the taxes, is under the necessity of rendering obedience thereto and may not question the regularity of the proceedings resulting in the warrant. It is equally true that if the State Board of Equalization had jurisdiction, as held by the trial court, and actually made the raise it did, its judgment constituted

a warrant which the respondent was bound to obey. The principle is stated and applied in *People vs. Halsey*, 53 Barb. 547, 550, in the following language:

"The statute in such cases makes it the duty of the county treasurer, after the expiration of twenty days from the return, to issue his warrant to the sheriff of the county, where the debtors reside, commanding him to make of the goods and chattels and real estate of such non-resident the amount of such tax, etc.— (Sess. Laws of 1851, Ch. 371, Sec. 6.) This is a mere ministerial duty which the statute imposes upon the treasurer, and peremptorily requires him to perform upon the return of the collector being duly made, containing the necessary facts. He has no discretion to exercise in the matter, and is invested with no judicial functions whatever in regard to it. He has no power nor authority to sit in judgment upon the acts of the assessors of the town, or upon those of the board of supervisors of the county. The statute has not constituted that officer the tribunal for challenging their proceedings or for reviewing and correcting their mistakes or errors of judgment. Nor can he, in answer to an application for a writ of mandamus against him for refusing to perform his duty, bring their proceeding into review for the purpose of establishing mistakes or errors in such proceeding. He may, however, in such a case, I apprehend, challenge the jurisdiction of any or all of these officers and tribunals, to make the assessment, or impose the tax thereon, * * *."

And in the case of *School District v. Clark*, 33 Me., at page 483, the court, in a similar proceeding, says:

"The treasurer has the power to issue such a warrant, and in some cases it becomes his duty. The collector, having a warrant from competent authority, was bound to proceed under it. With the anterior proceedings he had no concern. An officer appointed to collect the public revenue must, *ex necessitate rei*, obey his warrant, and he will be protected

in so doing. He holds in his hands the sinews of government, and neither his fears that individuals may be injured, nor his doubts about the validity of anterior proceedings, will excuse him. If individuals are injured they have their remedy at law, or they may see fit to waive any injury they have received. The collector has no judicial power. He is only to know whether his warrant proceeds from competent authority. If so, he must fulfill it as he is commanded. We do not now decide, nor is it necessary to examine, whether the anterior proceedings in assessing the tax were correct or not."

In *Waldron vs. Lee*, 5 Pick. 323, it was held that: "If a person appointed to warn a school district returns that he warned the inhabitants, but without stating the time or manner of warning, and the inhabitants meet and vote to raise a sum of money, and this vote is duly certified to the assessors, they are obliged to assess the tax, and neither they nor the town treasurer can inquire into the regularity of the proceedings antecedent to the meeting," and that upon refusal to act in the premises they would be coerced by mandamus. And further in the opinion, it was said: "The treasurer is merely a ministerial officer; he has no authority to pause in the execution of his duty, on the suggestion of errors or mistakes in the proceedings. If the facts upon which he is to act are properly certified to him, he has no discretion, but is obliged to issue his warrant. Whether the tax be legal or illegal, whether duly assessed or not, are not subjects for him to inquire about. If there be a tax, an assessment, a warrant to the collector, all certified to him by assessors duly qualified to act, his duty is clear, and he is peremptorily commanded by law to discharge it."

So here, the duties of respondent in relation to the matters in question are ministerial and if the facts upon which he is to act were properly certified to him from a tribunal with jurisdiction in the premises, that order con-

stitutes his warrant and he is bound to proceed under it. His only concern is to know whether "his warrant proceeds from competent authority," and, if so, fulfill it as he is commanded. If he may interpose the defense herein relied upon, every other assessor, dissatisfied with the action and direction of the State Board of Equalization, may do likewise. Is it possible that each of the assessors in this state can be permitted, against instructions from a constitutional tribunal having state wide jurisdiction in the matter, to decide for himself whether he will obey those instructions? If this be so, what would or could be the remedy by which the proper subjects of taxation could be listed and valued in accordance with the constitutional mandate that taxation shall be equal and uniform? If the assessors are the sole judges, and may defy the instructions of their superiors, it would depend upon the judgment or caprice, it might be, of each assessor what property he would list and value, and that which he would refuse to assess; and if one assessor were removed or indicted it would have no effect upon the others; or it might be that no one would take the trouble to see whether he was doing his duty, and the property would escape its just share of the burdens of government, the revenues be diminished and thereby the affairs of the public detrimentally affected or suspended. There would and could be no uniformity or equality in taxation under such a system. If each of the assessors is permitted to decide for himself what property shall be taxed and what exempted, what values shall be placed thereon, and defy the instructions of the State Board of Equalization in the discharge of duties imposed upon it by the Constitution, upon the alleged ground that it reached its conclusion without proper evidence, there is not only a failure to have taxation equal and uniform throughout the state, but as said in *State vs. Buchanan, supra;* "such a course if upheld and justified, * * * tends directly, not only to insubordination, and the

destruction of good government, but to anarchy and confusion."

2.    The respondent, however, questions the jurisdiction of the State Board of Equalization to make the raise upon the items and classes of property affected by its order, and we will proceed to a determination of that matter.

The principles announced in *People v. Pitcher*, 56 Colo. 343, will control herein so far as they apply to the questions involved. It is necessary, however, to bear in mind and consider the changes that have been made in the law applicable to the subject under consideration subsequent to the date of that decision. At that time there were four governmental agencies invested with duties pertaining to the assessment or ascertainment of the value of property in the state for the purpose of taxation. There was a county assessor in each county, a central body denominated the Colorado Tax Commission, a County Board of Equalization in each county and a State Board of Equalization. The only duties then or now exercised by the State Board of Equalization were imposed by the Constitution, for prior to that decision all its statutory powers, duties and privileges had been transferred to and invested in the Colorado Tax Commission. Chap. 133, S. L. 1913, p. 525. The duties of the State Board of Equalization at that time were solely to adjust and equalize the property values *among* the several counties of the state, and it possessed no power to raise or lower the aggregate of the values previously ascertained by other proper governmental agencies. The County Boards of Equalization, however, were then expressly invested with both constitutional and statutory duties. Their constitutional duties were to adjust and equalize such values within the respective counties, and thereunder they had no power to change the total value of the property as reached by the county assessors. This latter power, however, they did at one time possess by virtue of the statutes. §38 G. L., p. 754;

§5638 R. S. 1908; §12, Chap. 134, S. L. 1913. When county boards exercised such statutory and constitutional powers their conclusions established, as between individual property owners within the county, that there had been a just and equal value placed upon all such property so assessed. Then, as now, the duties of the Tax Commission were solely statutory. It made the original assessment of certain classes of property and could require the proper officials to make like assessments of all other property. It could also change the values of any property previously assessed by the assessor, and could increase by horizontal raise the total value of all the property in the county shown on the abstract of assessment. Some of these powers could be exercised only prior to equalization of the property within the county by the county board of equalization, while others could be exercised either prior or subsequent thereto. The office of County Assessor in each county was created by the Constitution, but the duties thereof were prescribed by legislative acts. All of these governmental agencies now exist; and no express change has been made as to the duties of either the assessors or the Tax Commission. This, however, is not true as to the respective County and State Boards of Equalization. Their duties have been materially changed; and this has affected the duties and acts of the other assessing or value-fixing agencies.

The provisions of the Constitution creating the State Board of Equalization and the respective County Boards of Equalization and defining their respective duties in force at the time of the decision in *People v. Pitcher, supra,* was § 15, (p. 45, R. S. 1908). This section read as follows:

"Sec. 15. There shall be a state board of equalization, consisting of the governor, state auditor, state treasurer, secretary of state and attorney general, also, in each county of this state, a county board of equalization, consisting of the board of county commissioners of said county. The duty

of the state board of equalization shall be to adjust and equalize the valuation of real and personal property among the several counties of the state. The duty of the county board of equalization shall be to adjust and equalize the valuation of real and personal property within their respective counties. Each board shall also perform such other duties as may be prescribed by law."

The section was amended in 1914—S. L. 1915, p. 163,— and now reads as follows:

"Section 15. There shall be a Board of Equalization for the state, consisting of the Governor, State Auditor, State Treasurer, Secretary of State and Attorney General. The duty of the said Board of Equalization shall be to adjust, equalize, raise or lower the valuation of real and personal property of the several counties of the state, and the valuation of any item or items of the various classes of such property.

"There shall be in each county of this state a County Board of Equalization, consisting of the board of county commissioners of said county. The duty of the County Board of Equalization shall be to adjust, equalize, raise or lower the valuation of real and personal property within their respective counties, subject to revision, change and amendment by the State Board of Equalization. The State Board of Equalization and the County Board of Equalization shall equalize to the end that all taxable property in the state shall be assessed at its full cash value, and also perform such other duties as may be prescribed by law; Provided, however, that the State Board of Equalization shall have no power of original assessment."

Under this constitutional amendment it is clear that the State Board of Equalization is the final arbiter in fixing values upon property which has been originally assessed for the purposes of raising public revenue. It is expressly made its duty to adjust, equalize, raise or lower the valua-

tion of real and personal property of the several counties of the state, and the valuation of any item or items of the various classes of such property. It will be observed that both the constitutional and statutory duties previously existing in the several county boards of equalization, whereby they equalized the assessments in their respective counties as returned by the county assessors, have now become constitutional duties, but their action in that regard is "subject to revision, change and amendment by the State Board of Equalization." Moreover, the State Board of Equalization and the County Boards of Equalization are expressly required to equalize "to the end that all taxable property in the state shall be assessed at its full cash value." Formerly the County Board of Equalization could equalize only between the tax-payers of the county, and the State Board of Equalization could equalize only to the end that the ratio between the counties should be just. The County Board of Equalization is now expressly authorized to raise or lower the valuation of any property, and the State Board is not only authorized to "revise, change and amend the action of the County Board" but also to raise or lower "any item or items of the various classes" of such property. Clearly items of a class may include the whole class, and if a board is given power to act with reference to any item of a class or items of classes, it possesses the power to act with reference to the whole class. The conclusion is, therefore, inevitable that the State Board of Equalization may raise the assessment upon property, or any part, parcel or class thereof which has been originally assessed for the year, by any of the agencies authorized to make such assessments, to its full cash value, since, otherwise, it has not performed its constitutional duty.

However, the respondent claims that the constitutional provision is not self-executing, as acts done under it without further legislation would be without notice to the property

owner, and his property thereby taken without due process of law. If this were true it would be a proper answer to say that it does not concern respondent. However, as mandamus is a discretionary writ, we would not order its issue if it manifestly appeared that the order of the State Board of Equalization had the effect to take property without due process of law, or that it was clearly invalid for any other reason. This would be the proper course, not because respondent has any right to make such a defense, or to rely upon such reason as an excuse for his insubordination, but because the citizens, that is, the portion of the public affected, should not be involved in expensive litigation in resisting a clearly invalid order. *People v. Pitcher, supra,* 384. It does not, however, manifestly appear that the order sought to be enforced is illegal or its legality in any wise doubtful. On the contrary, it is obvious that there is no basis for the contention. Every property owner in the state, or person having control of property therein, is required by law, each year, between designated dates, to make, under oath, and deliver to the assessor of the county wherein such property is situate, a full and correct schedule and description of all such property, upon blanks furnished by the assessors for that purpose. As to the personal property such owner or person is required to state the full cash value of all such property for the guidance of the assessor, but the assessor is required to determine for himself the value of each item, after an examination of the schedule, which necessarily includes the real estate, for it is also required to be entered on the schedule; and if not entered or no return is made thereof, it is, nevertheless, the duty of the assessor to place the same upon the assessment rolls. The assessors are required to give notice of any change they may make in the valuations so returned, and as to property, not returned, which they have assessed, and specify a date upon which they will hear objections to their action in the prem-

ises. §§5573, 5575, 5614, 5615, 5639, R. S. 1908. These sections of the statute and others of similar import fix the primary duty upon the assessors of the various counties of the state to make the original assessment, except as to certain classes of property, the primary assessments of which must be made by the Tax Commission. §5630 R. S. 1908; Chap. 133, p. 525, S. L. 1913. However, if the assessors omit property from the assessment list, which it was their duty to place thereon, the Tax Commission is empowered, upon notice given to the property owner, to make or enforce an original assessment thereof, in the manner prescribed by law. § 5636 R. S. 1908; chap. 133, p. 525, S. L. 1913; chap. 216, §§ 8, 13, S. L. 1911. This means that every property owner has specific notice and actual knowledge that all his property has been originally assessed, and taken within the grasp of the governmental agencies, for the purpose of ascertaining its full cash value and subjecting it to taxation for governmental purposes; and that each governmental agency may perform the duties imposed upon it respectively as the law prescribes.

The State Board is required to meet at a designated time and place and perform its constitutional duties "to the end that all taxable property in the state shall be assessed at its full cash value." This, it would seem, constitutes ample provision for the property owner to be heard, and all the notice to which he is entitled in matters of this character under the provisions of the state and federal constitutions. *Colo. Tax Commission v. Pitcher, supra; Bi-Metallic Inv. Co. v. The State Board of Equalization,* 56 Colo. 343, 138 Pac. 1010, affirmed by the Supreme Court of the United States, December 20, 1915, 239 U. S. 441, 36 Sup. Ct. 141, 60 L. Ed. Moreover, the performance by the State Board of its duty is not dependent upon the changes in the original assessment that may have resulted from the acts, whether properly or improperly performed, of the State Tax Com-

mission or the several county boards. The acts and reports of these agencies, in that respect, may and should be persuasive, but are not binding upon the State Board, for if it performs its constitutional duty it must bring every part and parcel of the property, originally assessed, to its full cash value. If it be a fact, as claimed by respondent, that the Tax Commission had no authority to raise the values fixed by the assessor, in his original assessment, of the classes and items of property, which it ordered raised, except by following the procedure prescribed in chap. 216, subdivisions 6 and 7 of § 13, S. L. 1911, the duty of the State Board of Equalization was neither lessened nor affected thereby. The property and every item thereof had been assessed by the assessor which constituted an original assessment. Moreover, his abstract of assessment, together with that of all other assessors of the state, had, in accordance with the law, been transmitted to the Colorado Tax Commission, and by the latter body, together with its own report, sent to the State Board of Equalization. The property that had been originally assessed was thus brought directly within the jurisdiction of the State Board of Equalization without regard to what the Tax Commission had or had not done in the premises. In relation to such property the State Board was, therefore, under the necessity of doing that which the Constitution required it to do, to the end that all taxable property in the state shall be assessed at its full value.

As disclosed by the evidence the exact wording of the resolution of the State Board of Equalization is, * * * "that the report of the Tax Commission as to the counties be adopted and each and every one of the raises reported be ordered by this board to be placed on classes as recommended by the Tax Commission"; and, the respondent contends, that this did not constitute such an act of the State Board of Equalization as to legally constitute the raise directed in the notice served upon him, and shows upon its face

that the board reached its conclusion without proper evi-
dence. The first contention is wholly without merit. The State
Board of Equalization in the resolution not only adopted
the report of the Tax Commission as to the counties, but,
in addition thereto, "ordered" "that each and every one of
the raises reported" be made "as recommended by the Tax
Commission." Now, to adopt a thing is "to take" such thing
"as one's own." Webster's New International Dictionary.
Therefore, if the raises purported to have been made by the
Tax Commission were of no force and effect, because it had
not followed the procedure prescribed, and the State Board
of Equalization possessed the power under the constitution
to make the raise, without following the statutory procedure
governing the action of the State Tax Commission in that
regard, as it clearly did, then when it made the report of the
Tax Commission "its own", that is, adopted it, and expressly
ordered each and every raise therein recommended to be
made, it thereby gave that report vitality. In judging of
the sufficiency and effect of an act of boards of this charac-
ter, it must be kept in mind that if their rulings are at all
ambiguous they "will be aided by construction so as to keep
them if possible within the jurisdiction of the board." 37
Cyc., p. 1079, Sub-Div. A. As to the claim and objection
that by adopting the report of the Tax Commission, it is
disclosed that the State Board reached its conclusions with-
out proper evidence, it would be sufficient to say that re-
spondent is not the proper party to raise that question, even
if it were true. If it were a fact it does not constitute a
jurisdictional defect, and is, therefore, wholly immaterial
as far as this proceeding is concerned. As hereinbefore
stated, the property with which the Board undertook to deal
had, without regard to what the Tax Commission had done
in relation thereto, been originally assessed by the assessor,
and the State Board of Equalization had acquired juris-
diction in the premises. Therefore, any error in its judg-

ment or mistake in its conclusions can be asserted, if at all, only in some direct proceedings by a party in interest. *Mayor v. Davenport,* 92 N. Y. 604.

Throughout the states of the Union boards of equalization are not generally required to examine witnesses or to base their action on any particular kind or *quantum* of evidence, but may proceed in their own way and act on any information which is satisfactory to them. In the absence of statutory requirements, even officers who make original assessments act upon their own knowledge, and individual judgment in fixing values for the purpose of taxation, and this is uniformly true of equalizing boards. *St. Louis Ry. Co. v. Surrell,* 88 Ill. 535, 536; *Fields v. Russell,* 38 Kan. 720, 721, 17 Pac. 476; *Russell v. Carlisle,* 8 S. W. 14, 15; 37 Cyc. 1076, 1077; *Hacker v. Howe,* 72 Neb. 385, 386, 391, 101 N. W. 255; *State v. Hannibal, etc., Ry Co.,* 101 Mo. 120, 13 S. W. 406.

Indeed, it has been held that the fact that the State Board of Equalization does not have before it the assessment rolls of the different counties as required by the statute, or any other particular written evidence provided by law, is not a jurisdictional defect, but a mere irregularity. *Mayor v. Davenport, supra; Dayton v. Multnomah County,* 34 Ore. 239, 55 Pac. 23; *Dayton v. Board of Equalization,* 33 Ore. 131, 50 Pac. 1099.

The principle is well stated and applied in *Mayor v. Davenport, supra,* in the following language:

"The assessors of the several towns first make out their rolls and determine the valuations. In this respect they act judicially, and any erroneous decision can only be corrected by a direct review of their proceedings, whenever they have kept within their jurisdiction. If they have so acted, their conclusions cannot be assailed either by a suit at law against them, or against those who take the further steps toward collection based upon their action.    *    *    *    The assessors

deliver their rolls to the supervisors, who are thereupon required to equalize the valuations between the several towns so that they shall bear a just relation to each other. This duty is also judicial. The precise question was determined in *Bellinger v. Gray,* 51 N. Y. 610. And what their duty is as between the towns of their county is exactly the duty of the State Board as between the several counties. That duty is, therefore, of a judicial character, and if they have acquired jurisdiction, any error in their judgment, or mistake in their conclusions can be asserted only in some direct proceeding for a review.   *   *   *

It is further alleged that the board increased the valuation of the city without evidence. If this means that they did not swear and examine witnesses upon the subject, that is true but immaterial. The law did not require it, and contemplated no such means of information. The State assessors had been doing that, and exhausting in each county the knowledge thus obtainable. The board came to the performance of its duty with adequate preparation, and exactly of the character and from the sources which the statute contemplated. If the complaint means that such information was wanting, the allegation is neutralized by the distinct admission that they had 'the general information possessed by members of the board in their acquaintance with the property contained in the State, and such oral general information as was conveyed to them by the state assessors, who had previously visited the various counties of the State,' and by the legal presumption of the proper performance of official duty. It is thus sufficiently apparent that the board had acted upon the kind of evidence and information which the law contemplated.

But it is said they adopted a schedule of equalization prepared by one of the assessors, and accepted it after ten minutes secret session. Somebody had to prepare it. Often, and in many boards, some one willing shoulder lifts more

than its proportion of the common burden. When, or how this schedule was made; how much of the labor and patience it represented; and how many of the other members had impressed upon it the results of their own knowledge we do not know. It is our duty to assume that it was carefully framed, and being so, we have no warrant to measure its wisdom by the brief minutes allotted to its adoption. Such a test might make havoc with the last day's work of many legislatures.

But is is finally said, and that is the only important averment, that the assessed values of the city were more than sixty per cent of the actual and market value; while those of other counties were less than sixty per cent of such real value; and yet the board of equalization added to the injustice by increasing the city valuation. If this is true, a great wrong was done, but it cannot be redressed in this action. The accusation touches not the jurisdiction of the board but the correctness of its judgment."

However, should we finally hold that where the law requires that a board of equalization act upon specific evidence, no other action may be permitted, the rule is in no wise applicable to the case at bar. Our Constitution is silent in regard to the evidence or character thereof essential to valid action upon the part of the State Board of Equalization in the performance of its duties. It may, therefore, resort to any source of information it may desire in reaching its conclusions, even though it be assumed that it may not reach its conclusions from its own knowledge. Indeed, the majority of this court, speaking thru Mr. Justice Hill, has heretofore held that where the fundamental law creates an agency and invests it with power, without prescribing the manner in which it may be exercised, the agency is at liberty to adopt its own mode of procedure. *People, ex rel. Moore v. Perkins,* 56 Colo. 1, 42, 43, 44, 137 Pac. 55, Ann. Cas. 1914D, 1154. If the board did not swear

and examine witnesses upon the subject, it is immaterial. The Constitution does not require it and contemplates no such means of information. The Board of Equalization had before it the sworn abstracts of assessment of the several county assessors and also the information that in the judgment of the State Tax Commission a certain raise upon specific classes of property should be made in order to bring the same to the constitutional requirement of full cash value, together with the general knowledge possessed by their own members in their acquaintance with the property contained in the state. It, therefore, appears that the board had jurisdiction, and acted upon the kind of evidence and information which the Constitution contemplates.

The completed assessment is purely the result of the collective judgment and discretion of the several assessing and equalizing agencies, whose duties are prescribed in the statutory and constitutional law of the state. The acts of some of these agencies may be changed by the acts of others, but the final and ultimate determination of the matter is vested in the State Board of Equalization. *Porter v. Ry Co.,* 76 Ill. 561. The constitutional provision creating it is complete in itself and, therefore, is self-executing. *Lyons v. Longmont,* 54 Colo. 112, 117, 129 Pac. 198. What that body is authorized to do by the terms of the Constitution is the measure of its power, and with the exercise of that power no court can interfere, unless its conclusion or judgment in a given matter is attacked by a party whose rights are affected thereby. The ascertainment of the ultimate fact that all the property of the state has been brought, for taxation purposes, to its full cash value rests on the judgment of the State Board of Equalization, not on the judgment of the judiciary. *State v. K. C., etc., Bridge Co.,* 106 Ark. 248, 153 S. W. 614, 617; *Stanley v. Supervisors of Albany Co.,* 121 U. S. 535, 542, 30 L. Ed. 1000, 7 Sup. Ct. 1234.

Entire accuracy in valuing property is difficult, if not impossible, of attainment. The utmost, therefore, that is practicable is that property shall be assessed at its full cash value as may be determined by the judgments of those upon whom the law devolves the duty of valuing it. This is necessary as there must be an end to reviews and corrections in the matter of raising public revenue, if government is to exist at all. The people, therefore, thru the constitutional amendment, created a central body of some of the principal officers of the state, who are elected by the suffrage of all the people, denominated it the State Board of Equalization, and invested it with final power in the premises. *Porter v. Ry. Co., supra.* As said in *Stanley v. Supervisors of Albany Co., supra,* p. 550:

"In nearly all the states, probably in all of them, provision is made by law for the correction of errors and irregularities of assessors in the assessment of property for the purposes of taxation. This is generally through boards of revision or equalization, as they are often termed, with sometimes a right of appeal from their decision to the courts of law. They are established to carry into effect the general rule of equality and uniformity of taxation required by constitutional or statutory provisions. Absolute equality and uniformity are seldom, if ever, attainable. The diversity of human judgments, and the uncertainty attending all human evidence, preclude the possibility of this attainment. Intelligent men differ as to the value of even the most common objects before them—of animals, houses, and lands in constant use. The most that can be expected from wise legislation is an approximation to this desirable end; and the requirement of equality and uniformity found in the constitution of some states is complied with, when designed and manifest departures from the rule are avoided.

To these boards of revision, by whatever name they may be called, the citizen must apply for relief against ex-

cessive and irregular taxation, where the assessing officers had jurisdiction to assess the property. * * * Their action being judicial, their judgments in cases within their jurisdiction are not open to collateral attack. If not corrected by some of the modes pointed out by statute, they are conclusive, whatever errors may have been committed in the assessment."

It is quite likely that in applying the new system of assessing and equalizing the value of property, injustice and hardship will, for a time, occur in certain cases. This is true in any change from one system to another. These inequalities, however, are not confined to the City and County of Denver alone, but occur in every county of the state. Moreover, they will continue, under any system, until there is an honest co-operation among public officials whose duty it is to ascertain and fix values in laying taxes. It would seem inconceivable to a fair-minded person, that the assessors of this state, the Tax Commission, the several County Boards of Equalization and the State Board of Equalization are confronted with so much difficulty in performing their respective duties. However, if each person will perform his own duty as prescribed by the statutes or Constitution, according to his best judgment, and all co-operate to the end that the constitutional mandate that all property shall be brought to its full cash value for the purposes of taxation, we feel certain that confusion and uncertainty in such matters will speedily disappear, and an equitable and just system of taxation be realized.

We are of the opinion that the alternative writ stated a cause of action and the return in no wise constituted a defense thereto. The judgment of the trial court is, therefore, reversed with directions to reinstate the case and enter an order making the alternative writ peremptory.

*Judgment reversed with directions.*

Decision *En Banc.*

Chief Justice GABBERT and Mr. Justice GARRIGUES specially concurring.

Mr. Justice HILL and Mr. Justice TELLER dissenting.

Chief Justice GABBERT specially concurring.

By the Constitution the State Board is vested with jurisdiction to adjust, equalize, raise and lower the valuation of property in the several counties, and the valuation of any item or items of the various classes of such property. Under this provision it ordered respondent to change specified classes on his tax roll. In making this order it affirmatively appears that the board acted within its jurisdiction. In such circumstances the law imposed upon respondent the imperative duty to forthwith change the valuation on his tax roll in conformity with such order. It was the judgment of the board. The duty of respondent to comply therewith is purely ministerial, and he cannot question or decide upon its validity. Hence, the character of the testimony the board considered cannot be inquired into, nor its sufficiency to sustain its order determined, for the obvious reason it would result in a collateral review of the judgment of the board. In brief, the people, by the Constitution, have vested the State Board with authority to adjust, equalize, raise or lower the valuation of property in the several counties, and in a proceeding to compel the respondent to comply with its order, within its jurisdiction, the courts cannot review the action of the board in a collateral proceeding.

In my opinion, however, the report of the commission was merely advisory. This was the view entertained by the Attorney General in the former Pitcher case. Such report cannot be treated as an assessment because property can only be assessed by the official the Constitution designates, which is the County Assessor. The statement that it affirmatively appears the board acted within its jurisdiction is

not to be taken as holding that the board in equalizing may increase the aggregate valuation returned by the County Assessors. That question was not argued by counsel for respondent.

Mr. Justice GARRIGUES concurs.

Mr. Justice TELLER dissenting.

The majority opinion holds that the respondent, being a ministerial officer, cannot question the validity of the order made by the State Board of Equalization, which order, it is held, was within the power of the board to make.

If these premises are correct, the conclusion must be admitted; but I cannot admit their correctness. The respondent questioned the power of the board to make the order, and denied that it had properly exercised such powers as it claimed to have.

Whether or not any question was raised by the respondent is immaterial. The alternative writ should not be made permanent unless it shows on its face such facts as authorize its issue.

"It is always true that in an application for a mandamus against a public officer the relator must show a good case upon the face of his petition: failing to do this, he would not be entitled to the writ, even though no answer whatsoever had been made to the application." *Schwanbeck v. People,* 15 Colo. 64, 68, 24 Pac. 575, 576.

If there is a substantial doubt as to the right to the writ, it will not issue: *Gruner v. Moore,* 6 Colo. 526.

Further, the petitioners by failing to demur to the first defense set up in the answer waived the objection upon which the cause is here decided. In *People v. Lothrop,* 3 Colo. 428, it was held that failure to raise technical objections, in a case of a mandamus against a public officer, constituted a waiver of them; and in several cases since that decision this court has considered the merits of such cases.

where the officer's right to question the acts of the State Board of Equalization was not challenged by the pleadings.

The trial court held that the State Board of Equalization exceeded its powers when it ordered a raise in the valuation of seventeen classes of property, leaving other classes unchanged.

If the court was correct as to the powers of the board, he was right in dismissing the alternative writ, since anyone, officer or not, may question a void order, and the writ cannot be used to enforce it.

The concurring opinion of the Chief Justice proceeds upon the theory that the order is not void, and hence cannot be attached collaterally

My dissent from the judgment of reversal is based upon the ground that the order is void for the reason stated by the trial court, viz: that, the board had no authority to change the valuation of classes, as such.

I am of the opinion, also, that the trial court did not err in hearing the case on the issue made by the complaint and the first defense of the answer and that the court was correct in its finding that the State Tax Commission made no such an investigation of values as would justify it in recommending an increase, or the State Board of Equalization in ordering it.

It is not, however, necessary to consider that subject in detail, since I find ample reason for affirming the judgment on the question of law above suggested.

A brief review of the decisions of this court relating to the powers of the State Board is necessary to make clear my position.

In *People v. Lothrop, supra,* it was held that the power to determine the valuation of taxable property was lodged in the County Assessor and Boards of County Commissioners, and that the State Board of Equalization had no

power to increase the aggregate valuation of property above the valuation as returned by the counties.

In *People v. Ames*, 27 Colo. 126, 60 Pac. 346, it was held that the State Board of Equalization exceeded its powers, and its act was void, when it attempted to change the values of different items, or of classes or kinds of property, its authority · extending only to changing valuations as returned by the County Assessors as "entireties."

In the case of *Colorado Tax Commission v. Pitcher*, 56 Colo. 343, 138 Pac. 509, it was said: "It is conclusively presumed, however, that as between individual property owners within the county, there has been a just value placed thereon, that is, a value relatively equal." That is to say: the. classes of property assessed in a county are conclusively presumed to be assessed on the same percentage of cash value, if not at actual value. True, this decision was handed down after the constitutional amendment under consideration was drawn and ordered submitted to the People; but that fact does not change the situation. The decision made no new law, but simply announced what the law was and had been from the first. *Chilcott v. Hart*, 23 Colo. 40-56, 45 Pac. 391, 35 L. R. A. 41.

In this state of the law the Constitution was amended in 1914, as shown in the majority opinion. At that time it had been settled by the decisions heretofore cited that the State Board of Equalization could not increase the aggregate of the county assessments, or change the valuation of items or classes of property; and that it was conclusively presumed that as between the several classes of property assessed by the County Assessors, and equalized by the County Commissioners, the valuations were relatively equal.

The amendment is to be construed in the light of these facts, and no powers can be allowed to the board except those expressly given, or fairly to be implied from those given.

The original section is changed but little in the matters covered by the first paragraph of the amendment.

In addition to the power to "adjust and equalize," the board is empowered to "raise or lower" the valuation of real and personal property of the several counties. The only other change is in the use of the word "of" instead of "among" before the word "several." Considering these changes in a section which had been held to give no power to change valuations except in equalizing among the counties, it appears that the purpose was to authorize the board to change the aggregate of the county assessments; in other words, to give the board the power which was denied to it by the ruling in *People v. Lothrop, supra.*

The board is also authorized to adjust, equalize, raise or lower "the valuation of any item or items of the various classes of such property."

As we have seen, the valuations as between classes are conclusively presumed to be equal, that is, made upon the same percentage of actual value, hence there can be no reason for changing the valuation of any class, or a part of the classes. If one is wrong, all are wrong, and the remedy is by exercising the power given to the board to change the valuation of the county assessment as an entirety.

In the majority opinion the right on the part of the board to raise the valuation of a class is derived from the power to raise the valuation of items, but the reasoning is fallacious. It is true that the valuation of a class will be increased if *all* the items of that class are increased in valuation, but, while that is the result, it comes from a re-valuation of items, one by one, till all have been re-valued. It is in no sense a valuation of a class, and produces a very different result. If the valuation as between items is unfair, a proper re-valuation of such items *seriatim* will be fair and just; but a like result does not follow from a change in

the valuation of the class as a whole. The latter would raise or lower the valuation of all items of the class, regardless of the justice of the change. If any items are assessed at their full cash value, while others are not, an arbitrary raise of the class as an entirety to its full cash value, will assess the first named items above their value, and leave other items still below their full value.

Manifestly the law does not so intend, and the argument in favor of that construction is entitled to no weight.

That the power to re-value classes is not intended to be given, appears further from the fact that the authority given is to change the valuation of any item or items *of the various classes..* Had it been intended to grant power to raise the value of classes, the language would naturally have been "to adjust, etc., the valuation of any class or classes of such property, or any item or items thereof."

The amendment in unmistakable language enlarges the power of the board to the extent which the board had in two cases assumed it to be; in both of which cases this court had held such assumption unfounded, and the action of the board void. If the purpose was to include also the power to re-value classes of property, which right had also been denied to the board by the rulings of this court, is it not reasonable to say that the intent would have been expressed as clearly as it is as to the other two matters?

This consideration is made conclusive by the fact, already mentioned, that classes were presumed to be valued upon a common basis, and relatively fairly and equally, hence there was no reason for a re-valuation of any one of them, and, of course, no need that the board have power thus to re-value them.

The board is also given power to revise, change or amend the valuation of the County Board of Equalization, but that power must be held to extend no farther than is necessary for the proper exercise of the powers specifically

given in the first part of the section. To hold otherwise is to violate the rules of construction that: "where words of general import follow specific designations the application of the general language is controlled by the specific." *Gibson v. People,* 44 Colo. 605, 99 Pac. 335.

The theory of our government, as expressed in the state Constitution, and manifested by numerous legislative enactments, is that local affairs shall, as far as practicable, be managed by local officers, and this amendment should not be construed to change that policy, unless the purpose so to do clearly appears. No such purpose is expressed or suggested in the amendment. On the contrary, it declares that both the State Board of Equalization and the County Boards of Equalization "shall equalize to the end that all taxable property in the state shall be assessed at its full cash value;" and ends with the provision that the State Board "shall have no power of original assessment." The powers granted to the State Board are intended to accomplish an expressed purpose, which does not require the making of original assessments, and with which changes in the valuation of classes of property are in direct conflict.

Reading the amendment in the light of the law as it was when adopted I conclude that it does not give the board power to change the valuation of classes of property as was done in this case. Its act in so doing was, therefore, void, and may be questioned by anyone.

The majority opinion practically takes the assessment of property away from the local authorities, and places it in the Tax Commission and the State Board of Equalization. This makes it possible for a state administration to compel the tax payers to provide whatever state revenues it sees fit to require. Instead of practicing economy and keeping state expenditures within a fixed revenue, the administration may make an arbitrary increase in assessments to produce such an amount of taxes as it has determined to be needed.

The case at bar illustrates the evil of the system. The record clearly shows that the State Board of Equalization adopted the recommendation of the Tax Commission, which was based upon no investigation of values worthy the name. It conclusively appears that the valuation of all town and city lots and their improvements was increased some $46,-000,000.00, and the only reason given for it was that some real property out of the business district had been assessed too low. Likewise it appears that the valuation of personal property was raised, because it was believed that much taxable personal property had not been assessed at all. The result, of course, is that property which had been assessed at its full cash value is now assessed at over twenty per cent more than its value; and this, forsooth, is done under the guise of equalizing values, so as to make the burden of taxation uniform, and just to all.

The trial court recognized and commented upon this wrong to the tax payers, and was fully justified in holding that the people of the state never intended to sanction a procedure so manifestly contrary to their best interests.

Upon the ground that the raise was made arbitrarily and without due regard to values, as well as upon the ground that there was no power in the board to make it, the judgment should be affirmed.